# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Detention of | No. 50699-8-II |
| B.M. | |
| | PUBLISHED OPINION |

JOHANSON, P.J. — B.M. appeals from an order requiring the involuntary administration of antipsychotic medication under RCW 71.05.217(7). B.M. argues that (1) the superior court commissioner lacked a constitutionally compelling state interest to involuntarily administer antipsychotic medication, (2) the State failed to present sufficient evidence in support of its petition to involuntarily administer antipsychotics, and (3) the commissioner's order is invalid because it failed to direct the maximum dosages that may be administered by the State. We affirm.

## FACTS

### I. BACKGROUND

In September 2016, B.M. was out jogging when he felt excruciating pain. He came to the conclusion that his neighbors shot him with a "Wi-Fi weapon" and were responsible for his injury. Verbatim Report of Proceedings (VRP) (June 13, 2017) at 9. He then unhooked his neighbor's internet cable, threw a planter through the back windshield of his neighbor's car, broke the car

windows with a stick, and dented the car. The State charged B.M. with second degree malicious mischief, but B.M. was found to lack the capacity to stand trial, and his criminal charges were dismissed.

On June 13, 2017, a superior court commissioner presided over the resulting civil commitment petition. Ultimately, the commissioner found B.M. to be "gravely disabled" and involuntarily committed B.M. for up to 180 days at Western State Hospital. Clerk's Papers (CP) at 10.

## II. HEARING ON PETITION TO ADMINISTER ANTIPSYCHOTICS

Nine days later, Dr. Liban Rodol, B.M.'s treating psychiatrist at Western State Hospital, filed a petition for involuntary treatment with antipsychotic medication under RCW 71.05.217(7).

At the hearing in the superior court, Dr. Rodol testified that B.M.'s current diagnosis was a "[s]chizoaffective disorder, bipolar type." VRP (June 30, 2017) at 4. Dr. Rodol said that B.M. refused to accept any antipsychotic medication and that he still exhibited delusions of his neighbors attacking him. Additionally, Dr. Rodol testified that B.M. said that he would take only Celexa and Klonopin. Celexa and Klonopin treat anxiety and depression, and Dr. Rodol opined they would not be effective to treat B.M.'s symptoms. In Dr. Rodol's opinion, antipsychotic medication would help with psychotic symptoms like delusions, and it could also work as a mood stabilizer to help with manic episodes. Dr. Rodol believed that antipsychotic medication was necessary for B.M. to recover to the point where he would be discharged.

Dr. Rodol testified that since he had filed the petition, there had been multiple incidents where B.M. had been verbally aggressive towards staff and had instigated fights. In Dr. Rodol's

opinion, B.M.'s behavior would likely continue or worsen if he remained off of antipsychotic medication.

Dr. Rodol testified that antipsychotic medication was both necessary and effective in treating B.M. In his opinion, alternative treatments like seclusion, restraints, or milieu therapy would not treat B.M.'s psychotic symptoms and would not address concerns about getting him discharged and keeping people safe. B.M. had previously taken an antipsychotic, Seroquel, and Dr. Rodol testified that "presumably [B.M.] tolerated the medication" without too many problems. VRP (June 30, 2017) at 10.

B.M. testified that he had taken antipsychotic medication in his past and that he had a very strong reaction to it. He said he "fear[s] for [his] life when [he] take[s] it." VRP (June 30, 2017) at 26. He testified that he was not willing to take antipsychotic medication and that the medical professionals would have to forcibly inject him every time.

## III. RULING

In his oral ruling, the commissioner said he was "not exactly 100 percent sure one way or the other" but that he would "allow the order to stand." VRP (June 30, 2017) at 36-37. The commissioner entered findings of fact and conclusions of law. Finding of fact 4 said the State had "a compelling interest in administering antipsychotic medication" because

> ☒ [B.M.] has suffered or will suffer a severe deterioration in routine functioning that endangers [B.M.'s] health or safety if he/she does not receive such treatment, as evidenced by [B.M.'s] past behavior and mental condition while he/she was receiving such treatment;
> ☒ [B.M.] will likely be detained for a substantially longer period of time, at increased public expense, without such treatment [;]
> ☒ Other: _Has been aggressive and goading others into trying to fight and without medication it is likely to continue or worsen.

CP at 20-21. The commissioner also entered finding of fact 5, which stated that the antipsychotic medication was necessary and effective and that alternatives were less effective because they would be more likely to prolong the length of commitment and would not address B.M.'s symptoms.

The commissioner authorized the State to administer one antipsychotic at a time and gave B.M. some input and the ability to veto one of the options. Additionally, the commissioner determined that review would occur in 60 days. The order remained in effect until November 30, and on that day a new civil commitment order was entered.

ANALYSIS

I. MOOTNESS

As a threshold issue, the State argues that the case is moot. Although the case is moot, we exercise our discretion to address the issues presented.

A. PRINCIPLES OF LAW

A case is moot if a court cannot provide effective relief. *In re Det. of W.R.G.*, 110 Wn. App. 318, 322, 40 P.3d 1177 (2002). An appellate court may still decide a moot case if the case involves "matters of continuing and substantial public interest." *W.R.G.*, 110 Wn. App. at 322. However, challenges that are fact specific to a particular case and that are unlikely to recur will not support review. *W.R.G.*, 110 Wn. App. at 322. But when orders have adverse consequences in future commitment proceedings, an appeal is not moot. *In re Det. of M.K.*, 168 Wn. App. 621, 626, 279 P.3d 897 (2012); *In re Involuntary Treatment of L.T.S.*, 197 Wn. App. 230, 234, 389 P.3d 660 (2016).

## B. COLLATERAL CONSEQUENCES

This case is not moot because like an involuntary commitment order, an order to involuntarily administer antipsychotic medication can have collateral consequences. *See M.K.*, 168 Wn. App. at 626. The legislative intent in RCW 71.05.012 states that "the consideration of *prior mental history* is particularly relevant in determining whether the person would receive, if released, such care as is essential for his or her health or safety." (Emphasis added.) For individuals under a commitment order "a *prior history of decompensation leading to repeated hospitalizations or law enforcement interventions* should be given great weight in determining whether a new less restrictive alternative commitment should be ordered." RCW 71.05.012 (emphasis added); *see also* RCW 71.05.575(2) (when determining whether an offender is dangerous to himself or others "a court shall give great weight to any evidence submitted to the court regarding an offender's recent history of judicially required or administratively ordered involuntary antipsychotic medication while in confinement"); *see also* RCW 71.05.212(4)[1] (when conducting an evaluation prior to release for offenders with a mental illness believed to be dangerous, the designated professional "shall consider an offender's history of judicially required or administratively ordered antipsychotic medication while in confinement.").[2]

An order to involuntarily administer antipsychotic medication as part of B.M.'s prior medical history may have weight in future commitment orders. *See* RCW 71.05.012. Because

---

[1] The legislature amended RCW 71.05.212(4) in 2016 and the amendments took effect April 1, 2018. LAWS OF 2016, ch. 29, § 226. We cite to the current version of the statute because for our purposes, it has remained substantively the same.

[2] RCW 71.05.575(2) and .212(4) apply to offenders, not to individuals civilly committed.

each order to administer antipsychotic medication may have collateral consequences in future proceedings, this appeal is not moot even though B.M.'s order has expired. Thus, we exercise our discretion and consider the issues raised.

## II. COMPELLING STATE INTEREST

B.M. argues that the commissioner lacked a constitutionally compelling state interest when he authorized the State to involuntarily administer antipsychotic medication. We agree with the State that there is a compelling state interest that justifies the involuntary administration of antipsychotics.

### A. PRINCIPLES OF LAW

The Supreme Court has held that a person "possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." *Washington v. Harper*, 494 U.S. 210, 221-22, 110 S. Ct. 1028, 108 L. Ed. 2d 178 (1990).[3] The involuntary administration of medication can also interfere with a person's right to privacy and right to produce ideas. *State v. Hernandez-Ramirez*, 129 Wn. App. 504, 510, 119 P.3d 880 (2005); *see also State v. Farmer*, 116 Wn.2d 414, 429, 805 P.2d 200, 812 P.2d 858 (1991) ("We recognize a similar right to privacy to emanate from the specific guaranties of the Bill of Rights, from the language of the First, Fourth, Fifth, Ninth and Fourteenth Amendments, as well as from article I, section 7 of the Washington Constitution.").[4] The

---

[3] *See also* WASHINGTON CONST. art. I, § 3 ("No person shall be deprived of life, liberty, or property, without due process of law.").

[4] *See also* WASHINGTON CONST. art. I, § 5 ("Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right."); WASHINGTON CONST. art. I, § 7 ("No person shall be disturbed in his private affairs, or his home invaded, without authority of law.").

involuntary administration of antipsychotic drugs implicates the First Amendment because "of their potential impact on an individual's ability to think and communicate." *State v. Adams*, 77 Wn. App. 50, 56, 888 P.2d 1207 (1995). However, these protections are not absolute. *Adams*, 77 Wn. App. at 56.

Involuntarily committed individuals have the right to refuse the administration of antipsychotic medication. RCW 71.05.217(7). However, a court may order the administration of antipsychotic medication if

> the petitioning party proves by clear, cogent, and convincing evidence that [(1)] there exists a *compelling state interest* that justifies overriding the patient's lack of consent to the administration of antipsychotic medications or electroconvulsant therapy, [(2)] that the proposed treatment is necessary and effective, and [(3)] that medically acceptable alternative forms of treatment are not available, have not been successful, or are not likely to be effective.

RCW 71.05.217(7)(a) (emphasis added). The statute also requires the court to "make specific findings of fact concerning: (i) The existence of one or more compelling state interests; (ii) the necessity and effectiveness of the treatment; and (iii) the person's desires regarding the proposed treatment." RCW 71.05.217(7)(b). If an individual is unable to make a "rational and informed decision," the court is required to make "a substituted judgment." RCW 71.05.217(7)(b).

In *In re Detention of Schuoler*, our Supreme Court identified four sufficiently compelling interests to justify the involuntary administration of medical treatment: "'(1) the preservation of life; (2) the protection of interests of innocent third parties; (3) the prevention of suicide; and (4) maintenance of the ethical integrity of the medical profession.'" 106 Wn.2d 500, 508, 723 P.2d 1103 (1986) (quoting *In re Guardianship of Ingram*, 102 Wn.2d 827, 842, 689 P.2d 1363 (1984)). *Schuoler* also instructed that this list was not exhaustive and that when making a decision about

involuntary administration of medical treatment, a superior court should consider whether there is "a countervailing state interest as compelling" as these four listed interests. 106 Wn.2d at 508.

B. DURATION OF INVOLUNTARY CONFINEMENT AND INCREASED PUBLIC EXPENSE

B.M. assigns error to the commissioner's finding that the State has a compelling interest because B.M. "will likely be detained for a substantially longer period of time, at increased public expense, without such treatment." CP at 20. B.M. argues that this does not meet the standard established in *Schuoler* because concerns about cost or efficiency have never been held to be a compelling state interest.[5] The State argues that it "has a clear interest in treating the symptoms of mental illness that necessitate involuntary commitment, such that psychiatric patients may be safely released to less restrictive settings." Resp't's Br. at 14. We agree with the State.

B.M. cites to *Robinson v. City of Seattle*, 102 Wn. App. 795, 826, 10 P.3d 452 (2000), and *Stanley v. Illinois*, 405 U.S. 645, 656, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972), to support his argument. In *Robinson*, taxpayers were challenging the constitutionality of the City's preemployment urinalysis drug testing program. 102 Wn. App. at 800. Division One of this court analyzed whether the City had a compelling interest to justify its intrusion upon privacy. *Robinson*, 102 Wn. App. at 823. The court determined that the City's interest in cost or efficiency was not constitutionally compelling because "cost alone has never been held to be a compelling interest justifying governmental intrusion upon a fundamental right." *Robinson*, 102 Wn. App. at 826. However, *Robinson* is distinguishable. *Robinson* did not involve an individual committed

---

[5] Because we hold that the commissioner complied with RCW 71.05.217(7)(b) by identifying at least one compelling state interest, we do not address the other two asserted compelling state interests.

involuntarily for treatment, and the State's interest in B.M.'s commitment is not based on "cost alone." *Robinson*, 102 Wn. App. at 826.

In *Stanley*, when discussing the State's interest in separating a child from a father without a hearing, the Court said, "[T]he Constitution recognizes higher values than speed and efficiency." 405 U.S. at 656. *Stanley* is also distinguishable because it did not involve the involuntary administration of medication. Here, the State's interest is not only in "speed and efficiency," but rather the State has an interest in preventing B.M. from being confined indefinitely. *Stanley*, 405 U.S. at 656.

The State relies on *Schuoler* to support its argument that this is not merely a cost-saving measure but that it is a compelling state interest to prevent prolonged commitment. In *Schuoler*, our Supreme Court said that

> [t]he doctors' testimony reveals a compelling state interest in treating Schuoler. Dr. McCarthy testified that because of her disabilities and repeated admissions to medical facilities Schuoler has constituted a tremendous financial burden for the State. . . . Dr. Hardy testified that without treatment Schuoler "may end up in the back wards of [a] state hospital, a helpless creature that nobody can ever take care of." . . . Both doctors testified that drug therapy was not helping Schuoler, and that with [electroconvulsive therapy] she had an 80 percent chance of recovery.

106 Wn.2d at 509 (third alteration in original). Therefore, our Supreme Court identified as a compelling state interest the prevention of prolonged detention at State expense that comes with "repeated admissions to medical facilities" when without treatment an individual is unlikely to recover and may end up in a state facility long-term. *Schuoler*, 106 Wn.2d at 509. This is similar to the interest the commissioner identified here that B.M. "will likely be detained for a substantially longer period of time, at increased public expense, without such treatment." CP at 20. As a result, *Schuoler* strongly supports the conclusion that this is a compelling state interest.

9

The State also relies on the purposes of the "Involuntary Treatment Act" set out in RCW 71.05.010. Two purposes of the Act are

> (b) [t]o prevent inappropriate, indefinite commitment of mentally disordered persons . . . and to eliminate legal disabilities that arise from such commitment;
> (c) [t]o provide prompt evaluation and timely and appropriate treatment of persons with serious mental disorders.

RCW 71.05.010(1).[6] The purposes of the Act support the conclusion that the State has a compelling interest in preventing the indefinite commitment of an individual and an interest in providing "timely and appropriate treatment." RCW 71.05.010(1)(c). This is more than just an interest in cost or efficiency.

We hold that the commissioner did not violate B.M.'s rights when it found that the State had a compelling interest in involuntarily administering antipsychotics in order to prevent prolonged commitment.

### C. SCOPE AND MEANING OF RCW 71.05.215 AND .217

B.M. also emphasizes that the language in two of the commissioner's findings that (1) B.M. will be detained for substantially longer and (2) B.M. has suffered or will suffer severe deterioration come from RCW 71.05.215(1) rather than from RCW 71.05.217.[7] B.M. argues that

---

[6] The legislature amended RCW 71.05.010(1) in 2016 and the amendments took effect April 1, 2018. LAWS OF 2016, ch. 29, § 203. We cite to the current version of the statute because for our purposes, it has remained substantively the same.

[7] RCW 71.05.215(1) provides that "[a] person found to be gravely disabled or presents a likelihood of serious harm as a result of a mental disorder . . . has a right to refuse antipsychotic medication unless it is determined that the failure to medicate may result in a likelihood of serious harm or substantial deterioration or substantially prolong the length of involuntary commitment." The legislature amended RCW 71.05.215 in 2016 and the amendments took effect April 1, 2018, and was also amended in 2018, which amendments took effect July 1, 2018. LAWS OF 2016, ch. 29, §

10

the legislature did not identify these factors as "compelling interests" and that RCW 71.05.215 must be evaluated in light of RCW 71.05.217. B.M. says that we should resolve any ambiguity between these two statutes in a manner that avoids constitutional concerns. We reject this argument.[8]

"'[P]assing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration.'" *West v. Thurston County*, 168 Wn. App. 162, 187, 275 P.3d 1200 (2012) (quoting *Holland v. City of Tacoma*, 90 Wn. App. 533, 538, 954 P.2d 290 (1998)). B.M. fails to explain why the State's "compelling interests" must be rooted in these statutes or why we must resolve an alleged ambiguity between the statutes. But it is immaterial to our analysis above whether the legislature identified these interests as compelling state interests or not, and we hold above that the State had at least one compelling state interest in involuntarily administering antipsychotic medication.

### III. INSUFFICIENT EVIDENCE

#### A. COMMISSIONER APPLIED CORRECT LEGAL STANDARD

B.M. next argues that the commissioner applied the wrong legal standard because its *oral* ruling indicated that it did not apply the clear, cogent, and convincing evidence standard. B.M.'s argument fails.

---

228; LAWS OF 2018, ch. 201, § 3008. We cite to the current version of the statute because for our purposes, it has remained substantively the same.

[8] The State relies on RCW 71.05.215(2), which states, "The authority shall adopt rules to carry out the purposes of this chapter. These rules shall include . . . (c) [f]or continued treatment beyond thirty days through the hearing on any petition filed under RCW 71.05.217, the right to periodic review of the decision to medicate by the medical director or designee." However, this does not support the State's argument that RCW 71.05.215(1) applies only until a petition is filed.

1.      PRINCIPLES OF LAW

Washington law requires that in order to justify the involuntary administration of antipsychotic medications, the petitioning party has the burden of proving by clear, cogent, and convincing evidence that there is a compelling state interest. RCW 71.05.217(7)(a). When the standard is "clear, cogent and convincing evidence," the fact at issue must be shown to be "'highly probable.'" *In re Det. of LaBelle*, 107 Wn.2d 196, 209, 728 P.2d 138 (1986) (quoting *Pawling v. Goodwin*, 101 Wn.2d 392, 399, 679 P.2d 916 (1984)).

A superior court's oral ruling "'has no final or binding effect, unless formally incorporated into the findings, conclusions, and judgment.'" *In re De Facto Parentage & Custody of M.J.M.*, 173 Wn. App. 227, 242 n.13, 294 P.3d 746 (2013) (quoting *Ferree v. Doric Co.*, 62 Wn.2d 561, 567, 383 P.2d 900 (1963)). When the superior court's written findings are unambiguous, it is unnecessary to look to the oral ruling. *In re Dependency of C.M.*, 118 Wn. App. 643, 650, 78 P.3d 191 (2003).

2.      CLEAR, COGENT, AND CONVINCING EVIDENCE

In his oral ruling, the commissioner stated, "As you gathered from my pauses, I am not exactly 100 percent sure one way or the other. I am going to allow the order to stand." VRP (June 30, 2017) at 36-37. B.M. argues that the commissioner indicated he was unsure in his decision and that the State's petition was not an order that the commissioner was to give deference to. However, the written findings were unambiguous and they clearly stated that "[t]he court makes the following findings of fact by clear, cogent, and convincing evidence." CP at 19. The oral ruling has no binding effect unless formally incorporated into the written findings. *M.J.M.*, 173 Wn. App. at 242 n.13. Additionally, the clear, cogent, and convincing standard does not require

the trial judge to be 100 percent sure—the fact at issue just needs to be "'highly probable.'" *LaBelle*, 107 Wn.2d at 209 (quoting *Pawling*, 101 Wn.2d at 399). Therefore, we hold that the commissioner used the correct legal standard.

### B. SUFFICIENT EVIDENCE IN SUPPORT OF THE STATE'S PETITION

B.M. also assigns error to findings of fact 4 and 5 and argues that the State presented insufficient evidence for the commissioner's findings. We disagree.

### 1. PRINCIPLES OF LAW

We review challenges to the sufficiency of the evidence in the light most favorable to the State. *In re Det. of Kelley*, 133 Wn. App. 289, 295, 135 P.3d 554 (2006). A commissioner cannot order the administration of antipsychotic medication unless the petitioner proves by "clear, cogent, and convincing evidence that there exists a compelling state interest that justifies overriding the patient's lack of consent to the administration of antipsychotic medications." RCW 71.05.217(7)(a). The petitioning party must also prove by clear, cogent, and convincing evidence that "the proposed treatment is necessary and effective" and that other alternative forms of treatment will likely not be effective. RCW 71.05.217(7)(a).

When the standard is "clear, cogent, and convincing . . . the findings must be supported by substantial evidence in light of the 'highly probable' test." *LaBelle*, 107 Wn.2d at 209 (quoting *Pawling*, 101 Wn.2d at 399). We do not disturb the superior court's findings "if supported by substantial evidence which the lower court could reasonably have found to be clear, cogent and convincing." *LaBelle*, 107 Wn.2d at 209.

2.      FINDINGS SUPPORTED BY SUBSTANTIAL EVIDENCE

     a.      DURATION OF INVOLUNTARY CONFINEMENT AND INCREASED PUBLIC EXPENSE

B.M. challenges the finding that the State has a compelling interest because B.M. "will likely be detained for a substantially longer period of time, at increased public expense" without treatment. CP at 20. B.M. argues that the State did not meet its burden because he had been involuntarily committed for only 17 days out of the 180-day commitment period at the time the court issued the order. B.M. also argues that "[i]ncidents of verbal aggression, or encouraging others to act aggressively, during that brief period of time" did not show he would be held for a longer period of time if not administered antipsychotics. Br. of Appellant at 21.

B.M.'s commitment can be prolonged if another petition is filed on the grounds that he"[c]ontinues to be gravely disabled."[9] RCW 71.05.320(4)(d).[10] Dr. Rodol testified that B.M. still exhibits delusions about his neighbors attacking him. Dr. Rodol testified that antipsychotics, like Seroquel, can help with psychotic symptoms and can also function as mood stabilizers. He also testified that if B.M. did not start taking antipsychotic medication it was not likely he could recover to the point where he could be discharged.

---

[9] Gravely disabled is defined as when a person as a result of a mental disorder "(a) [i]s in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety." RCW 71.05.020(22).

[10] The legislature amended RCW 71.05.320 in 2016 and the amendments took effect April 1, 2018 and also amended in 2018, which amendments took effect on July 1, 2018. LAWS OF 2016, ch. 29, § 237; LAWS OF 2018, ch. 201, § 3012. We cite to the current version of the statute because for our purposes, it has remained substantively the same.

Additionally, B.M.'s detention can be prolonged if he "(i) [h]as threatened, attempted, or inflicted physical harm upon the person of another, or substantial damage upon the property of another, and (ii) as a result of a mental disorder . . . or developmental disability presents a likelihood of serious harm." RCW 71.05.320(4)(a). Dr. Rodol testified that B.M. has been verbally aggressive towards staff and that he tried to instigate fights with his peers and staff. Therefore, the State presented sufficient evidence to establish that B.M. would be committed for a longer period of time if he was not involuntarily medicated. We hold that this finding is supported by substantial evidence in which the commissioner could have reasonably found to be clear, cogent, and convincing.[11] *LaBelle*, 107 Wn.2d at 209.

      b.      NECESSARY AND EFFECTIVE

B.M. assigns error to the commissioner's finding of fact 5 that antipsychotic medication is necessary and effective because of his prognosis with and without treatment and that alternatives are less effective because they are more likely to prolong commitment and they would not address symptoms of his illness. B.M. argues that the State did not meet its burden to show that the antipsychotics were both necessary and effective. We disagree.

B.M. argues that Dr. Rodol offered nothing except his opinion that the drugs were "necessary and effective." Br. of Appellant at 22. B.M. also argues that the State did not show that B.M. responded well to antipsychotics or that this was necessary only 17 days after B.M.'s commitment. We disagree.

---

[11] Because we hold that this compelling state interest is supported by substantial evidence, we do not consider whether the findings that B.M. engaged in aggressive and goading behavior and that B.M. risked severe deterioration are supported by substantial evidence.

Dr. Rodol testified that the only medications that B.M. was willing to take would not treat his symptoms. Dr. Rodol explained why antipsychotics, specifically Seroquel, would be effective. He stated that "Seroquel is an antipsychotic, so it can help with psychotic symptoms, like hallucinations and delusions. And it also can function as mood stabilizers, so it can help prevent manic episodes. It helps regulate moods, so it helps with both." VRP (June 30, 2017) at 8. Dr. Rodol also testified that taking antipsychotics was necessary for B.M. to recover to a point where he could be discharged. Dr. Rodol opined that other alternatives like seclusion, restraints, or milieu therapy would not treat B.M.'s psychotic symptoms and would not alleviate concerns about getting him discharged. Thus, there was substantial evidence that the State presented at trial to support the commissioner's finding that antipsychotic medication would be necessary and effective in treating B.M.

We hold that this finding was supported by substantial evidence of a clear, cogent, and convincing nature. *LaBelle*, 107 Wn.2d at 209.

3. CONCLUSION

The finding that the State has a compelling interest because B.M. will likely be committed for a longer period of time without treatment with antipsychotics is supported by substantial evidence that the commissioner could have found to be clear, cogent, and convincing. In addition, there was clear, cogent, and convincing evidence that antipsychotic treatment was necessary and effective. Therefore, we hold that the State met its burden under RCW 71.05.217(7)(a).

IV. MAXIMUM DOSAGES

B.M. next argues that the order was invalid because the commissioner "failed to adequately limit the psychiatrist's discretion" by specifying the maximum dosages. Br. of Appellant at 24.

The State argues that because B.M. did not raise this issue before the commissioner, he has not preserved the issue on appeal under RAP 2.5(a). B.M. replies that the error is manifest and affected his constitutional rights to "liberty, privacy, and First Amendment rights." Appellant's Reply Br. at 3. He asserts that the record is sufficiently developed for review. B.M. fails to show any error is manifest or that any error affected his constitutional rights. Thus, he failed to preserve this issue for review.

### A. PRINCIPLES OF LAW

Generally, appellate courts will not consider errors raised for the first time on appeal. RAP 2.5(a). A party may, however, raise for the first time a "manifest error affecting a constitutional right." RAP 2.5(a)(3). The appellant must demonstrate the error is manifest and "truly of constitutional dimension." *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009). In order for an error to be manifest, there must be a showing of actual prejudice. *O'Hara*, 167 Wn.2d at 99.

### B. RAP 2.5(a) PRESERVATION ON APPEAL

We address B.M.'s argument seemingly on the merits in order to determine whether the error was manifest and thus preserved. B.M. relies on the Ninth Circuit cases *United States v. Hernandez-Vasquez*, 513 F.3d 908 (9th Cir. 2008), and *United States v. Williams*, 356 F.3d 1045 (9th Cir. 2004), to support his argument that the order was invalid because the commissioner did not identify the maximum dosages.

*Hernandez-Vasquez* involved a *Sell*[12] order to forcibly medicate the defendant to render him competent to stand trial. The court held that a *Sell* order must identify "(1) the specific

---

[12] There are different requirements that must be met for a *Sell* order, which involves the involuntary administration of drugs to render an individual competent to stand trial. *Sell v. United States*, 539 U.S. 166, 179, 123 S. Ct. 2174, 156 L. Ed. 2d 197 (2003). The State must prove "(1) important

medication or range of medications that the treating physicians are permitted to use in their treatment of the defendant, (2) *the maximum dosages that may be administered*, and (3) the duration of time that involuntary treatment of the defendant may continue before the treating physicians are required to report back to the court on the defendant's mental condition and progress." *Hernandez-Vasquez*, 513 F.3d at 916-17 (emphasis added).

*Hernandez-Vasquez* is distinguishable because it involved a *Sell* order. The court in *Hernandez-Vasquez* emphasized that "*Sell* inquiries are disfavored in part because the medical opinions required for a *Sell* order are more multi-faceted, and thus more subject to error, than those required for a *Harper*[13] analysis." 513 F.3d at 915. B.M. fails to show why the reasoning in *Hernandez-Vasquez* should apply to this case.

Another Ninth Circuit case, *Williams*, involved a mandatory medication requirement for supervised release. 356 F.3d at 1051. The court provided that "[o]ur requirement that medically-informed records be developed before mandatory antipsychotic medication conditions are imposed similarly encompasses an independent and timely evaluation of the supervise [sic] by a medical professional, including attention to the type of drugs proposed, their dosage, and the expected duration of a person's exposure." *Williams*, 356 F.3d at 1056.

---

government interests are at stake; (2) administration of medication is substantially likely to render the defendant competent to stand trial and substantially unlikely to have side effects that may undermine the fairness of the trial; (3) involuntary medication is necessary to further the State's interests; and (4) administration of the medication is medically appropriate." *Hernandez-Ramirez*, 129 Wn. App. at 510.

[13] *Harper* held that the State is permitted to administer antipsychotic drugs to an inmatewho was mentally ill if the inmate is dangerous to himself or others and the treatment is in his best interest. 494 U.S. at 227.

In *United States v. Loughner*, 672 F.3d 731, 758 (9th Cir. 2012), the court addressed both *Hernandez-Vasquez* and *Williams* and found that they did not apply. A *Harper* hearing was held on whether Loughner should be involuntarily medicated on dangerousness grounds. *Loughner*, 672 F.3d at 739. Loughner argued that the hearing violated the due process clause because there were no limitations placed on the dosages of drugs that could be administered. *Loughner*, 672 F.3d at 758.

The court reasoned, "The difference between *Harper* and *Sell* is critical here." *Loughner*, 672 F.3d at 758. The court explained that when an inmate is involuntarily treated because he is a danger to himself or others, like in *Harper*, the primary concern is "penological and medical." *Loughner*, 672 F.3d at 758. However, when an inmate is involuntarily medicated to render him competent to stand trial, like in *Sell*, the primary concern is legal. *Loughner*, 672 F.3d at 758-59. The court stated that Loughner's psychiatrist "must be able to titrate his existing dosages to meet his needs." *Loughner*, 672 F.3d at 759. The court further reasoned that "[n]o one who is being treated for a serious medical condition would benefit from a court order that restricted the drugs and the dosages permissible." *Loughner*, 672 F.3d at 759.

Here, there was no *Sell* hearing. Like in *Loughner*, the primary reason that the State involuntarily medicated B.M. was for medical reasons rather than a legal reason like in a *Sell*

hearing. 672 F.3d at 758-59. Therefore, B.M. has failed to show that the commissioner was required to specify the maximum dosages.

Additionally, the court in *Loughner* held that there was no due process clause violation when there was no limitation placed on the dosages of drugs to be administered. 679 F.3d at 759-60. Here, there is also no due process violation and B.M. has not demonstrated that the lack of maximum dosages in the court's order was a manifest error affecting a constitutional right. *See O'Hara*, 167 Wn.2d at 98-99.

We hold that the alleged error is not a manifest error and that B.M. failed to preserve this issue on appeal. Accordingly, we do not consider it further.

## V. CONCLUSION

In conclusion, orders to involuntarily administer antipsychotics can have collateral consequences in later commitment proceedings, and here, B.M. raises issues of continuing and substantial public concern. We hold that the commissioner identified at least one compelling state interest that justified the involuntary administration of antipsychotics to B.M. Further, substantial evidence supports the commissioner's findings that the State has a compelling state interest and that antipsychotic medication was necessary and effective. B.M. failed to preserve for review whether the order was invalid because the commissioner did not specify the maximum dosages to be administered.

No. 50699-8-II

We affirm.

JOHANSON, P.J.

I concur:

SUTTON, J.

21

BJORGEN, J. (dissenting) — The State has shown no compelling interest justifying the order allowing it to medicate B.M. with antipsychotic drugs against his will. Therefore, I dissent.

## I. SUPPLEMENTAL STATEMENT OF FACTS

On June 13, 2017, the superior court ordered that B.M. be committed for 180 days of involuntary mental illness treatment under chapter 71.05 RCW. Nine days later, on June 22, B.M.'s treating psychiatrist at Western State Hospital, Dr. Liban Rodol, filed a petition to force B.M. to be treated with antipsychotic drugs against his will.

Eight days after the petition was filed, the superior court entered an order allowing B.M. to be involuntarily medicated with such drugs. By checking boxes on a printed form, the court found a compelling interest in administering antipsychotic medication for three reasons. First, the court found that B.M. has suffered or will suffer a severe deterioration in routine functioning that endangers his health or safety if he does not receive such treatment, as evidenced by his past behavior and mental condition while receiving prior treatment. Clerk's Papers (CP) at 20. Second, the court found that without the requested treatment, B.M. will likely be detained for a substantially longer period of time, at increased public expense. *Id.* at 20. Finally, the court found that B.M. has been aggressive and has goaded others into trying to fight and that, without medication, this is likely to continue or worsen. *Id.* at 21. The court did not check the box denoting another pre-printed reason: that B.M. had recently threatened, attempted or caused serious harm to self or others. CP at 20.

The majority opinion ably describes the evidence in support of these findings. As the opinion points out, Dr. Rodol testified to incidents in which B.M. had been very verbally

aggressive towards staff members and other patients and had tried to instigate fights with them. Dr. Rodol also testified, though, that these incidents all occurred after he filed the petition to administer antipsychotic drugs. Thus, at the time of filing there was no evidence of aggressive or goading behavior by B.M. at the hospital.

As far as alternatives are concerned, Dr. Rodol's testimony does not suggest that the hospital actually tried alternative forms of treatment, but it simply asserts that other alternatives, such as seclusion, restraints, or milieu therapy, would not treat the underlying psychotic symptoms. VRP, 6/30/17 at 12. However, in his petition, Dr. Rodol did note milieu therapy as a possible alternative treatment, but alleged that it would be less effective than antipsychotic medications because it is more likely to prolong length of commitment for involuntary treatment. CP at 16. Neither the petition nor the record indicate whether milieu therapy was ever attempted.

As to potential side effects of antipsychotic medication, Dr. Rodol noted possible sedation, possible weight gain, possible increase in blood sugar levels, metabolic changes in some cases, such as an increase in cholesterol or lipids, and in some cases movement disorders, like stiffness, rigidity, and restlessness. He noted also that tardive dyskinesia with involuntary movements could result from long-term use of some anti-psychotic medications. *Id.*

Courts, however, have recognized much more profound effects. In *United States v. Williams*, the court described the effects of antipsychotic drugs in the following terms:

> First, the drugs "tinker[] with the mental processes," *Mackey v. Procunier*, 477 F.2d 877, 878 (9th Cir.1973), affecting cognition, concentration, behavior, and demeanor. While the resulting personality change is intended to, and often does, eliminate undesirable behaviors, that change also, if unwanted, interferes with a person's self-autonomy, and can impair his or her ability to function in particular contexts. *See Riggins[ v. Nevada*,] 504 U.S. [127,] at 137, 112 S. Ct. 1810[, 118 L. Ed. 2d 479 (1992)]; *id*. at 142-44, 112 S. Ct. 1810 (Kennedy, J., concurring).

No. 50699-8-II

356 F.3d 1045, 1054 (9th Cir. 2004).

Similarly, the majority opinion in *Riggins* recognized that antipsychotic drugs "'can have serious, even fatal, side effects.'" *Riggins*, 504 U.S. at 134 (quoting *Washington v. Harper*, 494 U.S. 210, 229-30, 110 S. Ct. 1028, 108 L. Ed. 2d 178 (1990)). Among the side effects, the court noted "tardive dyskinesia" as

> "'a neurological disorder, irreversible in some cases, that is characterized by involuntary, uncontrollable movements of various muscles, especially around the face. . . . [T]he proportion of patients treated with antipsychotic drugs who exhibit the symptoms of tardive dyskinesia ranges from 10% to 25%, [although] studies of the condition indicate that 60% of tardive dyskinesia is mild or minimal in effect, and about 10% may be characterized as severe.'"

*Id.* (quoting *Harper*, 494 U.S. at 229). Finally, this court has also recognized that antipsychotic drugs have a potential impact on an individual's ability to think, communicate and produce ideas. *State v. Adams*, 77 Wn. App. 50, 56, 888 P.2d 1207 (1995); *State v. Hernandez-Ramirez*, 129 Wn. App. 504, 510, 119 P.3d 880 (2005).

II. LEGAL ANALYSIS

A.    The Governing Legal Standards

The gravity of the interests at stake is well reflected in the case law. An individual "possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." *Harper*, 494 U.S. at 221-22. Based on the side effects described above, the Ninth Circuit described this as a "particularly severe" invasion of liberty. *Williams*, 356 F.3d at 1054.

In addition, our Supreme Court has recognized that the right to privacy under the federal and state constitutions "provides individuals with the freedom of choice to refuse electroconvulsive therapy, to decline medical treatment in certain instances and to oppose blood

24

tests in certain instances." *State v. Farmer*, 116 Wn.2d 414, 429, 805 P.2d 200, *amended on denial of reconsideration*, 812 P.2d 858 (1991). In *Hernandez-Ramirez*, 129 Wn. App. at 510, we held that the involuntary administration of antipsychotic drugs interferes with a person's right to privacy. Finally, we have held that the forced administration of antipsychotic drugs implicates First Amendment protection because of their potential impact on an individual's ability to think and communicate. *Adams*, 77 Wn. App. at 55-56.

In deciding when the State may compel the administration of electroconvulsant therapy, *In re Detention of Schuoler*, 106 Wn.2d 500, 508, 723 P.2d 1103 (1986), held that the State can "limit even fundamental liberty interests by regulations (1) justified by a compelling state interest, and (2) narrowly drawn." This standard was incorporated into RCW 71.05.217(7)(a), which states that a court may order the involuntary administration of antipsychotic medication or electroconvulsant therapy only if:

> the petitioning party proves by clear, cogent, and convincing evidence that [(1)] there exists a compelling state interest that justifies overriding the patient's lack of consent to the administration of antipsychotic medications or electroconvulsant therapy, [(2)] that the proposed treatment is necessary and effective, [(3)] and that medically acceptable alternative forms of treatment are not available, have not been successful, or are not likely to be effective.

This statute requires that the compelling state interest justify overriding the lack of consent. This is consistent with *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 661, 115 S. Ct. 2386, 132 L. Ed. 2d 564 (1995), which held that a compelling state interest is one "important enough" to justify the intrusion into an individual's constitutional rights. (Emphasis omitted.) Thus, in applying these standards, the effect of these drugs on the individual's ability to think, communicate, concentrate and choose plays a pivotal role.

25

B.       The State Has Not Shown a Compelling State Interest Justifying Forced Medication

      1. Length and Expense of Commitment

The State offers as a compelling interest the finding that B.M. will likely be detained for a substantially longer period of time, at increased public expense. CP at 20. We have already stated that "cost alone has never been held to be a compelling interest justifying governmental intrusion upon a fundamental right." *Robinson v. City of Seattle*, 102 Wn. App. 795, 826, 10 P.3d 452 (2000). Similarly, the United States Supreme Court held in a case dealing with separating a child from a parent that "the Constitution recognizes higher values than speed and efficiency." *Stanley v. Illinois*, 405 U.S. 645, 656, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972). This rule applies with equal insistence to the forced administration of antipsychotic drugs.

As described above, these drugs tinker with mental processes, affecting cognition, concentration and behavior. *Williams*, 356 F.3d at 1054. They effect personality changes. *Id.* These, if unwanted, may rob an individual of the nucleus of character and autonomy. They may affect the individual's ability to think, communicate and produce ideas. *Adams*, 77 Wn. App. at 56. Thus, forcing an individual to take these drugs is to force that individual, against his will, to risk degrading his ability to think, to create, to understand, to communicate self and ideas, and to autonomously choose what type of person he is. These liberties are the beating heart of all other liberties. They make up our crowning zone of privacy, the sublime mysteries of the human mind. There might be reasons compelling enough to allow the State to order their sacrifice, but cost savings, speed, and efficiency are not among them. Those and similar rationales should be purged from any asserted justification.

The State's argument, then, reduces to reliance on the finding that without antipsychotic drugs, B.M. will likely be detained for a substantially longer period of time. As noted, RCW

71.05.217(7)(a) and *Vernonia School District* require that the compelling state interest be weighty enough to justify sacrificing the central constitutional rights just described. Any survey of the evils in a lengthy detention naturally gravitates to increased cost and reduced efficiency. For the reasons above, those considerations should play no role in justifying the forfeiture of the rights at stake.

That leaves, then, the justification in *In re Schuoler*, 106 Wn.2d at 509, that without treatment the individual "'may end up in the back wards of [a] state hospital, a helpless creature that nobody can ever take care of.'" 106 Wn.2d at 509 (quoting Report of Proceedings, at 53). *Schuoler* posits a situation that conceivably could justify the loss of the fundamental rights just discussed. However, the basis offered by the State for the forced administration of antipsychotics to B.M. falls well short of that in *Schuoler*.

Dr. Rodol testified that the medications that B.M. is willing to take would not treat his mental illness. However, in the petition for involuntary treatment Dr. Rodol also noted that milieu therapy was a possible alternative treatment, but neither the petition nor the record indicate whether that was ever attempted. At the hearing, the doctor's testimony about this and other alternative treatments was limited to the wholly conclusory statement that there were no less restrictive alternatives to medication that would treat the illness. The petition, though, discloses the rationale for abandoning this alternative treatment: milieu therapy would be less effective than antipsychotic medications because it is more likely to prolong length of commitment for involuntary treatment. CP at 16. In the doctor's view, involuntary medication was justified simply by the fact that alternative measures would take longer.

27

Discharging this patient sooner rather than later would certainly save the State time and money. Transforming B.M. into a more placid and compliant man would certainly save the State the time and trouble of trying to help a difficult patient through means that did not risk the impoverishment of his mental life. These bureaucratic goals, however, lie far from the interest recognized in *Schuoler*—preventing the permanent warehousing of a "helpless creature" beyond hope of recovery.

Soon after his admission, the State petitioned for involuntary medication without giving B.M. more time to change his mind about antipsychotics, without waiting to observe the longer term course of his illness, without waiting to see if he in fact was in the position of the patient in *Schuoler*, and without trying alternative treatments. The integrity of the elemental rights at stake, to think, to shape ideas, to communicate them and to choose one's own persona cannot be sacrificed in a rush to judgment to serve the mere administrative interests on which the State relies. Similarly, their sacrifice cannot rest on the conclusory opinion of a doctor that alternative treatments would not work, especially when they have not been fairly tried with the patient. These interests offered by the State are far from compelling enough to brush aside the constitutional guarantees of these fundamental rights.

2. Aggressive and Goading Behavior

The State argues that B.M.'s aggressive and goading behavior at Western State Hospital provides a compelling state interest for forcing the administration of antipsychotic drugs. In support, the State points out that *Schuoler* recognized the protection of the interests of innocent third parties as sufficiently compelling to justify overriding a patient's objection to medical treatment. 106 Wn.2d at 508.

The State's argument, though, overlooks the teaching of *Vernonia School District*:

It is a mistake, however, to think that the phrase "compelling state interest," in the Fourth Amendment context, describes a fixed, minimum quantum of governmental concern, so that one can dispose of a case by answering in isolation the question: Is there a compelling state interest here? Rather, the phrase describes an interest that appears *important enough* to justify the particular search at hand.

515 U.S. at 661. Although not involving a search, the circumstances here demand the same conclusion: whether an interest is compelling does not turn on abstractions from other decisions, but rather on whether the State's reasons are sufficiently important to override the constitutional interests they would forfeit. This is also the requirement of RCW 71.05.217(7)(a), discussed above.

The record shows that B.M. had been very verbally aggressive towards staff members and patients and had tried to goad some patients to fight. The protection of the staff and other patients from physical harm is undoubtedly a compelling interest in general. As shown, though, the question before us is not whether protection of innocent third parties is compelling in the abstract, but whether the level of risk from B.M's behavior is compelling enough to justify the intrusion into the fundamental constitutional rights at stake. *See* RCW 71.05.217(7)(a) and *Vernonia School Dist.*, 515 U.S. at 661.

For a number of reasons, the State has not made that showing. First, in neither the petition for involuntary treatment nor in the court order directing such treatment was the box checked denoting that B.M. had recently threatened, attempted or caused serious harm to self or others. CP at 20. Instead, the petition simply alleged that B.M.'s delusions might cause him to act aggressively or violently in the future. CP at 15. Second, the record does not show that the State attempted other methods of protecting the staff and patients, such as the alternatives

29

discussed above or other measures. Third, the threatening incidents at the hospital all occurred after the petition to administer antipsychotic drugs was filed. Thus, at the time of filing there was no evidence of aggressive or goading behavior by B.M. at the hospital, raising the possibility that his aggressive behavior was largely the result of the petition itself.

Neither the aggressive behavior by B.M. in the hospital nor the possibility of aggressive behavior in the future can justify forcing B.M. to take medications that are aimed at transforming his personality, not to mention risking impairment of his thoughts, his ability to understand, his ability to express himself, and his ability to choose. The proffered state interest is not sufficiently compelling to justify these trespasses.

Attending to psychiatric patients is critical work, often as dangerous as it is important. The beneficiaries of that service, the people of the state, owe to the staff and patients the funding and staffing levels needed to protect them. The constitution, however, does not allow the State to make up for inadequate funding and staffing by medically altering troublesome patients into more docile or compliant individuals against their will. In our country, that brave new world is foreclosed by law.

## III. Conclusion

In *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 639, 642, 63 S. Ct. 1178, 87 L. Ed. 1628 (1943), the Supreme Court held that requiring students to salute the flag and pledge allegiance

> transcends constitutional limitations . . . and invades the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control.

30

*Wooley v. Maynard*, 430 U.S. 705, 97 S. Ct. 1428, 51 L. Ed. 2d 752 (1977), in turn, held that the State may not compel individuals to display on their vehicles a license plate motto with which they disagree. At the core of the Court's rationale was its recognition of the right of freedom of thought, including both the right to speak and to refrain from speaking, and the "broader concept of 'individual freedom of mind.'" 430 U.S. at 714 (quoting *Barnette*, 319 U.S. at 633-34, 637, 645 (Murphy, J., concurring)).

Some decisions of the United States Supreme Court, in recent decades, have eroded the marketplace of ideas theory of the First Amendment,[14] as the choice of our leaders becomes monopolized by those with the greatest means to purchase campaign persuasions. At the same time, the other work of the First Amendment becomes more pressing: the protection of that "sphere of intellect and spirit" spoken of in *Barnette* and the "individual freedom of mind" cited in *Wooley*. 319 U.S. at 642; 430 U.S. at 714. What remains is the less pragmatic, but more transcendent purpose of protecting the free and incandescent workings of the human mind.

In our minds, we find room for the orbits of grace and vengeance and room for the choice between them; room to conjure the universe in a bony vault or scatter the stars of our fondest dreams. The forced administration of antipsychotic drugs trespasses directly on this ultimate zone of privacy. That intrusion should be warranted, if at all, only by the most urgent of reasons and after all reasonable alternatives have been tried and have failed. Perhaps *Schuoler* describes

---

[14] *See Buckley v. Valeo*, 424 U.S. 1, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976), and *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 130 S. Ct. 876, 175 L. Ed. 2d 753 (2010).

31

such a reason, avoidance of the lifetime warehousing of helpless patients. Most certainly the circumstances of this appeal do not.

_____
Bjorgen, J.