# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Detention of:<br><br>M.K.<br><br><div align="center">Appellant.</div> | No. 58068-3-II<br><br><br><br>UNPUBLISHED OPINION |

CRUSER, A.C.J. – MK appeals the superior court's 180-day commitment order under the "Involuntary Treatment Act," chapter 71.05 RCW.[1] He argues that the findings of fact are inadequate for review and that the evidence does not support the finding that he continues to be gravely disabled.[2] We hold that the findings of fact, combined with the oral ruling, are sufficient to permit review and that sufficient evidence supports the gravely disabled finding. Accordingly, we affirm.

---

[1] Appeals involving involuntary commitments are not moot because prior involuntary commitment orders have potential collateral consequences. *In re Det. of B.M.*, 7 Wn. App. 2d 70, 76-77, 432 P.3d 459 (2019). Accordingly, we address this appeal even though the 180-day involuntary treatment period has expired.

[2] MK also asserts that the evidence did not support a finding that a less restrictive alternative (LRA) placement was not in his best interest. But he presents no argument related to this issue, so we do not address it. RAP 10.3(a)(6); *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

FACTS

I.  BACKGROUND

In September 2021, the State petitioned to commit MK for 180 days of involuntary treatment at Western State Hospital (WSH) after he was found incompetent to stand trial on several felony charges and the charges were dismissed. MK voluntarily stipulated to a 180-day civil commitment. He also stipulated that the facts were sufficient to establish that he was gravely disabled and that he had committed third degree assault.

In March 2022, the State petitioned to extend the commitment for an additional 180 days. The court granted the petition after finding that MK continued to be gravely disabled as a result of a behavioral disorder.

In September, the State petitioned to extend the commitment for an additional 180 days. In this petition, the State alleged that MK continued to be gravely disabled as a result of a behavioral disorder and that he was not ready for an LRA.

II.  HEARING

The hearing on the third petition was held on October 3. Staff psychologist Dr. Larry Arnholt and MK were the only witnesses.

A.  ARNHOLT'S TESTIMONY

Arnholt testified that MK had been diagnosed with schizoaffective disorder - bipolar type. Arnholt further testified that MK was a level three sex offender and that this was MK's tenth admission to WSH since 2000.

Due to his behavioral health disorder, MK experienced delusional thinking and "confusion about relationships with others." Clerk's Papers (CP) at 85-86. Arnholt testified that MK had been

experiencing delusional thinking when he arrived at WSH in 2021 but that his delusional thinking had improved over time. For instance, six months earlier MK believed that he worked for the police as an undercover agent doing some type of special work that he could not talk about. At the time of the hearing, he believed "that he worked for the police department because they gave him a brightly colored vest and asked him to pick up garbage." *Id.* at 85. Arnholt opined that this demonstrated that the delusion was "resolving in that it is a bit less, . . . secretive and less confusing." *Id.*

Regarding MK's confusion about his relationships with others, Arnholt testified that a short time after MK arrived on the ward, he began following one of the female patients and stating that she was "a friend." *Id.* at 86. The female patient was moved to a different ward because she felt that MK was harassing her. Arnholt testified that MK's interactions with women and confusion about his relationships with them were concerning because of his sex offender status.

Despite MK's improvements, Arnholt stated that MK had demonstrated impaired judgment and aggressive behavior just a few days before the hearing. Arnholt testified that he had met with MK a few days earlier and had attempted to talk to him about his "basic attractions" in order to assess the placement concerns related to his sex offender status. *Id.* MK "became increasingly agitated" and "increasingly defensive" about this topic. *Id.* Arnholt agreed that this was an example of MK's "impaired judgment." *Id.*

Shortly after that meeting, MK approached Arnholt and said "in a rather threatening manner," that if he did not get out after the hearing he was "going to make it hell for" Arnholt. *Id.* at 86-87. MK also said "something about lighting a match on [Arnholt's] back." *Id.* at 87. Although Arnholt spoke with MK almost daily, MK had never been threatening before.

Regarding MK's insight into his condition, Arnholt testified that MK had insight and awareness into his diagnosis, that he was aware his medications helped him by decreasing his delusions, and that he did not currently need assistance with his activities of daily living. But when the State asked Arnholt if he thought MK would "consistently be able to ensure his basic health and safety needs are met," Arnholt responded that he did not. *Id.* at 86.

Arnholt testified that in his current condition, MK was not capable of making rational decisions regarding his treatment and that he needed a structured environment to meet his treatment needs. Arnholt was concerned that if something interfered with MK's access to medication or if he were to stop taking the medication, he "would return to the problematic level that led to [his tenth] hospitalization." *Id.* at 88-89. And Arnholt testified that MK's schizoaffective disorder and the resulting confusion, delusional ideas, and limited insight, "combined with his problematic sexual behavior and repeated offenses . . . would be a considerable concern if he were simply released with no supervision and no assurance he was taking his medication." *Id.* at 88. Arnholt also testified that MK's expressed plan upon release did not seem "viable." *Id.*

Arnholt also noted that though MK was currently compliant with his treatment, he still demonstrated that he had difficulty controlling his behavior, as evidenced by him becoming "surprisingly threatening" during the recent meeting. *Id.* at 90. Arnholt was concerned that MK would respond this way if he experienced pressure while in the community. And Arnholt opined that MK's behavior toward the woman on the ward and his lack of insight as to how that might make the other person feel was concerning given his status as a level three sex offender. Arnholt stated that he "would be concerned about [MK] being released to the community with tenuous

emotional control, . . . and his lack of insight into how his behavior or feelings are affecting [or] might affect [ ] others. *Id.* at 91.

When asked to assess whether MK would seek out mental health care and follow through on that care if released, Arnholt testified that he was unsure how long MK would follow through on treatment. He stated that MK might agree to take medication if the court ordered him to, but not necessarily if it was not court-ordered.

Arnholt concluded that MK was gravely disabled. Arnholt stated that because of MK's "predilection with sexual behavior [that] he is not willing to address or talk about in any sort of depth, and his quickness to be threatening to somebody that he knows fairly well like he was to [him] on the 29th, [he] would be concerned about [MK] being released to the community at this time." *Id.* at 92.

Arnholt recommended that MK remain at WSH "until appropriate less restrictive placement can be found." *Id.* But Arnholt was not aware of any currently available LRA that would be appropriate given MK's "history of problematic sexual behavior, as well as schizoaffective disorder." *Id.*

On cross-examination, MK asked if he was a danger to himself, and Arnholt responded that he did not think that MK would harm himself. But Arnholt also testified that he would be concerned that MK would be in danger if he placed "himself in a situation where he didn't have safe shelter and that sort of thing," and that this appeared to be the case. *Id.* at 93.

B.      MK'S TESTIMONY

MK testified that he had two recreational vehicles in Lakebay that he could live in. He stated that he had been able to live in them in the past and was able to care for himself. He said that he had supplemental security income of just over $700 a month and that he would consider obtaining food assistance. He also had a friend, Bill Lloyd, who could help him with transportation.

MK further testified that he took his medications at WSH and that he understood what they were for. And he testified that he could "[d]efinitely" continue his medications if discharged. *Id.* at 96. He stated that he had medical insurance under Medicare and Medicaid, that he knew how to obtain the medications if released, and that in the past he was able to obtain prescriptions and get them filled at MultiCare.

MK also testified that he wanted to be released to be with a feral cat that lived on his property and that he planned to return to participating in his church.

C.      COMMISSIONER'S ORAL RULING

In an oral ruling, the commissioner ruled that MK continued to be gravely disabled and that an LRA was not in his best interest, and ordered 180-days of additional involuntary treatment.

The commissioner stated that (1) Arnholt's testimony established that even with medication MK was still experiencing delusions, and (2) MK's anger and threatening reaction to Arnholt's questions demonstrated that MK had "tenuous emotional control." *Id.* at 106. The commissioner also found that MK's expressed release plan was "not well-formulated" because his first concern was taking care of a cat that he said was able to care for itself when he was not present and he did not realistically "address his medication needs, his mental health needs, and other needs." *Id.* at 106-07.

D.    WRITTEN FINDINGS OF FACT AND CONCLUSIONS OF LAW

The commissioner issued written findings of fact and conclusions of law and an order committing MK to 180 days of involuntary treatment. The commissioner expressly incorporated the oral ruling into the written findings of fact and conclusions of law.

The written findings included a section entitled "Facts in Support," in which the commissioner summarized the testimony. *Id.* at 51. Based on these facts, the commissioner checked a boilerplate finding stating that MK was gravely disabled "as a result of a behavioral health disorder" because he "manifest[ed] severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over actions, [and] is not receiving such care as is essential for health and safety." *Id.* at 51. As in the oral ruling, the commissioner also found that an LRA was not in MK's best interest.

### III.    Motion to Revise

MK moved to revise the commissioner's order. The superior court denied the motion.

### ANALYSIS

MK appeals the order extending his involuntary treatment for an additional 180 days. He argues that (1) the commissioner's written findings of fact are inadequate to permit review, and (2) the evidence is insufficient to support the gravely disabled finding.

### I.    ADEQUACY OF FINDINGS OF FACT

We first address MK's assertion that the commissioner's written findings of fact are inadequate to permit meaningful review because they merely contain boilerplate statutory language and a summary of the trial testimony. MK also contends that the commissioner's oral ruling cannot be used to supplement the inadequate findings because written findings are required.

7

Relying on *In re Detention of G.D.*, 11 Wn. App. 2d 67, 450 P.3d 668 (2019), MK argues that because written findings are required, the court's oral ruling is irrelevant. In *G.D.*, Division One of this court declined to consider the trial court's oral ruling to supplement inadequate written findings because adequate written findings were required under MPR 2.4(b)(4)[3] and *In re Detention. of LaBelle*, 107 Wn.2d 196, 218-19, 728 P.2d 138 (1986). 11 Wn. App. 2d at 70. But *G.D.* fails to acknowledge that in *LaBelle*, our supreme court expressly stated that otherwise inadequate written findings "may be supplemented by the trial court's oral decision or statements in the record." 107 Wn.2d at 219. Because *G.D.* did not acknowledge that *LaBelle* expressly permits consideration of the court's oral ruling, we decline to follow it and hold that we may consider the commissioner's oral ruling.

Here, the commissioner specifically incorporated the oral ruling into the written findings of fact and conclusions of law. MK does not assert that the written findings in this case as supplemented by the commissioner's oral ruling are inadequate to permit meaningful review. Accordingly, we turn to MK's sufficiency argument.

## II. SUFFICIENCY

MK argues that the evidence is insufficient to support the gravely disabled finding. We disagree.

---

[3] MPR 2.4(b)(4) requires written findings of fact and conclusions of law following hearings on 14-day involuntary commitment petitions. A similar rule, MPR 3.4(b) requires written findings of fact and conclusions of law following bench trials on 90- and 180-day involuntary commitment petitions.

A.    LEGAL PRINCIPLES

Following a motion to revise a commissioner's order, we "review the superior court's ruling, not the commissioner's decision." *In re Det. of L.K.*, 14 Wn. App. 2d 542, 550, 471 P.3d 975 (2020). "[T]he findings and orders of a court commissioner not successfully revised become the orders and findings of the superior court." *Maldonado v. Maldonado*, 197 Wn. App. 779, 789, 391 P.3d 546 (2017).

The State bears the burden of establishing a person is gravely disabled by clear, cogent, and convincing evidence. *LaBelle*, 107 Wn.2d at 209. Clear, cogent, and convincing evidence means that the ultimate fact at issue is shown to be "highly probable." *Id.*

When reviewing the trial court's involuntary commitment order, we consider whether, taking the evidence in the light most favorable to the State, the trial court's findings of fact are supported by substantial evidence and whether the court's findings of fact support its conclusions of law and judgment. *In re Det. of T.C.*, 11 Wn. App. 2d 51, 56, 450 P.3d 1230 (2019); *In re Det. of B.M.*, 7 Wn. App. 2d 70, 85, 432 P.3d 459 (2019). " 'Substantial evidence' is the quantum of evidence sufficient to persuade a fair-minded person." *In re Det. of H.N.*, 188 Wn. App. 744, 762, 355 P.3d 294 (2015). We do not review a trial court's decision regarding witness credibility or the persuasiveness of the evidence. *In re Det. of A.F.*, 20 Wn. App. 2d 115, 125, 498 P.3d 1006 (2021), *review denied*, 199 Wn.2d 1009 (2022).

B.    SUBSTANTIAL EVIDENCE OF GRAVE DISABILITY

Under chapter 71.05 RCW a person "may be involuntarily committed for treatment of mental disorders if, as a result of such disorders, they . . . are gravely disabled." *LaBelle*, 107 Wn.2d at 201-02. "Gravely disabled" is defined as:

> a condition in which a person, as a result of a behavioral health disorder: (a) Is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

RCW 71.05.020(25).[4]

The court found MK gravely disabled under subsection (b). Subsection (b) enables the State to provide the kind of continuous care and treatment that can break " 'revolving door' syndrome, in which patients often move from the hospital to dilapidated hotels or residences or even alleys, parks, vacant lots, and abandoned buildings, relapse, and are then rehospitalized, only to begin the cycle over again." *LaBelle*, 107 Wn.2d at 206 (quoting Nancy K. Rhoden, *The Limits of Liberty: Deinstitutionalization, Homelessness, and Libertarian Theory*, 31 Emory L.J. 375, 391 (1982)).

1.  SEVERE DETERIORATION IN ROUTINE FUNCTIONING

MK argues that the record does not establish that he manifested a severe deterioration in routine functioning because it showed that he had improved by the time of the October 2022 hearing. But MK's focus on his improvement at the time of the hearing is too narrow. The State may still establish recent proof of significant loss of cognitive or volitional control despite improvement as long as the respondent continues to manifest severe deterioration in routine functioning at the time of the hearing. *Id.* at 207, 210.

---

[4] RCW 71.05.020 has been amended since the petition was filed in this matter. See LAWS OF 2023, ch. 433, § 4; LAWS OF 2023, ch. 425, § 21. Because the amendments do not impact our analysis, we cite to the current version of the statute.

To prove that MK manifested a severe deterioration in routine functioning, the evidence had to establish a "recent proof of significant loss of cognitive or volitional control." *Id.* at 208. The evidence here was sufficient to show that MK still manifested severe deterioration in routine functioning.

MK was involuntarily committed to WSH just under a year before this hearing after having decompensated to the point he assaulted another person. And Arnholt testified that, although improved, MK was still experiencing delusional thinking at the time of the hearing despite being compliant with his medication and that as recently as a few days before the hearing he quickly became threatening and agitated when he was confronted with a topic he was unwilling to discuss. This evidence, viewed in the light most favorable to the State, demonstrates that MK experienced a significant loss of cognitive or volitional control at the time of his most recent commitment and that his loss of cognition, although improved, still existed at the time of the October 2022 hearing. And his recent aggression and threatening behavior demonstrates a recent loss of volitional control. Thus, the evidence supports a finding that MK manifested severe deterioration in routine functioning.

### 2. ESSENTIAL CARE

MK argues that the record does not establish that he would not receive such care as is essential for his health or safety if released because he was able to care for his activities of daily living while at WSH, he had insight into his need for medication and understood its benefit, he took his medication, and he agreed to continue to take his medication if discharged. He also argues that the commissioner's concern about MK's living situation and support do not establish grave disability because " 'uncertainty of living arrangements or lack of financial resources will not alone

11

justify continued confinement in a mental hospital.' " Br. of Appellant at 18 (quoting *LaBelle*, 107 Wn.2d at 210).

MK is correct that uncertainty of living arrangements and lack of resources cannot alone establish that he would not receive such care as is essential for his health or safety. *LaBelle*, 107 Wn.2d at 210. But Arnholt did not just express concern about MK's living arrangements or resources.

Arnholt also testified that MK was not capable of making rational decisions regarding his treatment, in part because he was not capable of even discussing aspects of his treatment related to his sex offender status, and that he was unsure of how long MK would be able to maintain his treatment without supervision. Additionally, MK's long history of admissions to WSH was also "particularly relevant" evidence that MK had difficulty maintaining treatment while in the community. RCW 71.05.012 ("For persons with a prior history or pattern of repeated hospitalizations or law enforcement interventions due to decompensation, the consideration of prior history is particularly relevant in determining whether the person would receive, if released, such care as is essential for his or her health or safety."). And although MK testified that he would continue to take his medication, the court clearly did not give any weight to this testimony, and we do not review a trial court's decision regarding witness credibility or the persuasiveness of the evidence. *A.F.*, 20 Wn. App. 2d at 125.

Taking Arnholt's testimony and MK's history in the light most favorable to the State, the evidence was sufficient to establish that MK would not receive such care as is essential for his health or safety if released. Thus, the evidence was sufficient to establish that the State proved that MK was gravely disabled by clear, cogent, and convincing evidence.

No. 58068-3-II

<div align="center">CONCLUSION</div>

Because the evidence is sufficient to support the court's findings and these findings support the conclusion that MK continued to be gravely disabled, we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

CRUSER, A.C.J.

We concur:

LEE, J.

PRICE, J.