# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Detention of:<br><br>J.H.,<br><br>       Appellant. | No. 55337-6-II<br><br><br><br>UNPUBLISHED OPINION |

 WORSWICK, J. – JH appeals an order imposing 180 days of involuntary mental health treatment based on the trial court's findings that he presented a substantial likelihood of repeating acts similar to a felony he committed and that he was gravely disabled. JH argues that the trial court erred by finding that (1) he presented a substantial likelihood of repeating similar acts, (2) he was gravely disabled, and (3) a less restrictive alternative was not in the best interest of JH or others.

 We hold that the trial court did not err by finding that JH presented a substantial likelihood of repeating similar acts, that he was gravely disabled, or that a less restrictive alternative was not in the best interest of JH or others. Accordingly, we affirm.

FACTS

I.     UNDERLYING ASSAULTS

In August 2019, JH's electricity had been turned off due to nonpayment. Tacoma Power discovered that the power at his residence had been turned back on and sent two of its employees, Steve Whipple and Mike Davis, to assess charges and turn the power back off.

When Whipple and Davis arrived, they noticed that the home was overgrown and covered in graffiti, including spray paint on the windows. They were not sure if anyone lived at the residence. They knocked a couple of times, but no one answered, so they walked over to the electric meter. The two noticed that the meter was turned on, so Davis removed the meter to turn it off. As Davis was locking up the service, JH confronted them. JH asked them what they were doing, and Whipple explained that that he and Davis were with Tacoma Power and that they were there to make sure that the service was off.

JH told them not to mess with his power and to turn it back on. Whipple decided to call customer service for more information. JH then pulled out a gun and pointed it at Whipple from 15 to 20 feet away. He fired a shot that landed on the ground between Whipple and Davis, one to two feet away from Whipple's foot. Whipple and Davis walked toward the meter to turn the power back on, and JH continued to point the gun at them. After the power was back on, JH said, " 'You guys get out of here. You get out of here, you f***ing Russians.' " Verbatim Report of Proceedings (VRP) at 22.

JH was charged with two counts of second degree assault. In May 2020, the trial court found that JH was not competent to stand trial, dismissed the charges, and ordered a mental health evaluation for civil commitment.

## II. PETITION AND HEARING

Doctors Christine Collins and Franklin Brown petitioned for JH to receive 180 days of involuntary treatment at Western State Hospital (WSH). At a hearing on the petition, Whipple and Davis testified to the above facts. Dr. Collins testified regarding her two meetings with JH for his civil commitment evaluation. Based on her evaluation, Dr. Collins diagnosed JH with schizophrenia. She explained that JH displayed disorganized speech and thought processes, which gave him difficulty completing a topic of conversation. He also discussed "delusional beliefs" and expressed paranoia concerning those beliefs. *Id.* at 44.

At the time of the hearing, JH had improved in his ability to hold a rational conversation for up to five minutes, but he would "still eventually discuss delusional beliefs including Russians or illegal immigrants and vandals wishing to harm him or his property." *Id.* at 47. Dr. Collins believed that these delusional beliefs would cause him difficulty interacting with others in the community.

JH's preoccupation with vandals and Russians seeking to hurt or kill him led Dr. Collins to also believe that JH was substantially likely to repeat acts similar to the assaults on Whipple and Davis. One month prior to the hearing, a social worker asked if JH would move back to his residence upon release, and he responded, " 'Well, I will eventually but my first purpose is to kill the vandals.' " *Id.* at 48. Dr. Collins tried to ask JH who the vandals were, but he would begin discussing other topics when asked this question.

Dr. Collins testified that JH's health had been improving while he was at WSH. However, she attributed his improvement "to the structured setting" of the hospital, including meals provided to him and consistent staff members to assist him with his needs. *Id.* at 50. JH was able to maintain

3

his activities of daily living, but he had been refusing medication for both his mental health and hyperthyroidism. Dr. Collins believed that, out in the community, JH would likely experience stressors that could worsen his symptoms and "erode his emotional control." *Id.*

JH also testified at the hearing. He admitted that he was not taking his thyroid medication because he did not believe he needed it. He also admitted that getting medical treatment in the community was not "at the top of [his] agenda." *Id.* at 59. When asked if he would be willing to have the hospital help him find a new residence, he explained that he preferred to live at home. He said that his house had been targeted for vandalism for a while, but he did not know who was vandalizing it because he has not caught anyone. He had painted his own windows, inside and out, to cover up some of the vandalism, and he also painted some of the words on his house.

JH also testified that, in 2012, he was experiencing abnormally high fatigue, and began thinking that "they" were coming into his home and tampering with his food, perhaps by putting viruses in it. *Id.* at 57. He also said that "they" had stolen food from his freezers and vandalized the inside of his home. *Id.* In addition, he believed "[t]hey got ahold of [him] somehow" in 2019 and did something to his legs that resulted in four blood blisters on each of his calves. *Id.* at 58.

The trial court found that JH had committed acts constituting second degree assault, that these acts constituted a violent offense, and that JH presented a substantial likelihood of repeating similar acts due to a behavioral health disorder. In addition, the trial court found JH to be gravely disabled as a result of a behavioral health disorder resulting in "severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over [his] actions" and that JH would not receive care essential for health and safety. CP at 23. The trial court

4

also found that a less restrictive alternative to involuntary detention was not in the best interest of JH or others.

The trial court ordered 180 days of involuntary treatment. JH appeals the trial court's order.

ANALYSIS

JH argues that the record does not support the trial court's findings that he presents a substantial likelihood of repeating acts similar to the assaults on Whipple and Davis, that he was gravely disabled, or that a less restrictive alternative was not in JH's best interest. We disagree and affirm.

I.     STANDARD OF REVIEW

When the State seeks a 180-day involuntary commitment, its burden of proof is by clear, cogent, and convincing evidence. RCW 71.05.310;[1] *In re Det. of LaBelle*, 107 Wn.2d 196, 209, 728 P.2d 138 (1986). This means that the trial court's findings must be supported by substantial evidence sufficient to show the ultimate fact in issue to be "highly probable." *LaBelle*, 107 Wn.2d at 209. " 'Substantial evidence is the quantum of evidence sufficient to persuade a rational fair-minded person' that the premise is true." *In re Det. of A.M.*, 17 Wn. App. 2d 321, 330, 487 P.3d 531 (2021) (quoting *In re Det. of H.N.*, 188 Wn. App. 744, 762, 355 P.3d 294 (2015)). We will not disturb the trial court's findings if they are supported by substantial evidence which the trial court could reasonably have found to be clear, cogent, and convincing. *In re Det. of B.M.*, 7 Wn. App. 2d 70, 85, 432 P.3d 459 (2019); *LaBelle*, 107 Wn.2d at 209. When evaluating whether the evidence

---

[1] RCW 71.05.310 has been amended since the petition was filed in this case. *See* LAWS OF 2020, ch. 302 § 44. Because the amendments do not impact our analysis, we cite to the current version of the statute.

was sufficient, we view the evidence in the light most favorable to the petitioner. *A.M.*, 17 Wn. App. 2d at 330.

## II.    SUBSTANTIAL LIKELIHOOD OF REPEATING SIMILAR ACTS

JH argues that there was not sufficient evidence for the trial court to find that he presented a substantial likelihood of repeating similar acts. We disagree.

When a court finds that an individual is incompetent to stand trial for felony charges, the charges are dismissed without prejudice and the individual "must undergo a mental health evaluation for civil commitment and treatment." *In re Det. of M.W.*, 185 Wn.2d 633, 642, 374 P.3d 1123 (2016); RCW 10.77.086(4). An individual may be committed for up to 180 days of involuntary treatment if the individual has been found incompetent to stand trial and criminal charges have been dismissed, has committed acts constituting a felony, and "presents a substantial likelihood of repeating similar acts" due to a behavioral health disorder. RCW 71.05.280(3);[2] RCW 71.05.320(1)(c).[3]

Here, JH fired a shot at Whipple and Davis and continued to threaten them with a firearm until they turned his power back on. As they left, JH said, " 'You guys get out of here. You get out of here, you f***ing Russians.' " VRP at 22. At the commitment hearing, Dr. Collins testified that she believed JH presented a substantial likelihood of repeating similar acts. She held this opinion because JH continued to express concern that vandals and Russians sought to harm or kill him,

---

[2] RCW 71.05.280 has been amended since the petition was filed in this case. *See* LAWS OF 2020, ch. 302, § 41. Because the amendments do not impact our analysis, we cite to the current version of the statute.

[3] RCW 71.05.320 has been amended since the petition was filed in this case. *See* LAWS OF 2021, ch. 263, § 2, ch. 264, § 10, and LAWS OF 2020, ch. 302, § 45. Because the amendments do not impact our analysis, we cite to the current version of the statute.

including telling a social worker at WSH that, upon release, his " 'first purpose is to kill the vandals.' " *Id.* at 48. At the time of the hearing, JH was able to hold a rational conversation for up to five minutes, but after that would begin discussing his beliefs regarding vandals and Russians.

This evidence is sufficient to persuade a rational, fair-minded person that JH presented a substantial likelihood of repeating acts similar to the assaults on Whipple and Davis. *See A.M.*, 17 Wn. App. 2d at 330. We hold that the trial court's finding is supported by substantial evidence that the court could reasonably have found to be clear, cogent, and convincing. *See LaBelle*, 107 Wn.2d at 209. Therefore, it was not error for the trial court to find that JH presented a substantial likelihood of repeating similar acts.

### III.    GRAVELY DISABLED

JH argues that the State did not prove that he was gravely disabled because there was no evidence of a recent deterioration in routine functioning. We hold that the evidence supports the trial court's finding that JH was gravely disabled.

Another ground under which an individual may be involuntarily committed is grave disability. RCW 71.05.280(4). An individual is gravely disabled when the individual "manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety" due to a behavioral health disorder. RCW 71.05.020(24)(b).[4] When the State seeks involuntary treatment under this prong, its evidence "must include recent proof of significant loss of cognitive or volitional control," and it must establish a factual basis to conclude that the

---

[4] RCW 71.05.020 has been amended since the petition was filed in this case. *See* LAWS OF 2021, ch. 263, § 11, ch. 264, § 20, and LAWS OF 2020, ch. 302, § 3. Because the amendments do not impact our analysis, we cite to the current version of the statute.

individual "would not receive, if released, such care as is essential for his or her health or safety." *LaBelle*, 107 Wn.2d at 208. It is not enough to simply show that an individual has a mental illness or that care and treatment is in the person's best interests. *Id.* at 207-08. Rather, "such care must be shown to be *essential* to an individual's health or safety and the evidence should indicate the harmful consequences likely to follow if involuntary treatment is not ordered." *Id.* at 208.

The trial court found that JH was gravely disabled because he manifested severe deterioration in routine functioning as evidenced by repeated and escalating loss of cognitive or volitional control and was not receiving care essential for his health and safety.

JH argues that there was no evidence regarding a *recent* deterioration in routine functioning. However, the State was not required to offer such evidence. *See id.* Rather, there must be a "factual basis for concluding that an individual 'manifests severe [ ] deterioration in routine functioning,' " and this evidence "must include recent proof of significant loss of cognitive or volitional control." *Id.* (quoting RCW 71.05.020(1)(b)).

The record contains substantial evidence that JH suffered from a severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control. As an initial matter, the evidence regarding the assaults and JH's likelihood of repeating similar acts is recent proof of a loss of cognitive or volitional control, as these acts were a result of JH acting on his delusions regarding Russians. In addition, Dr. Collins testified that she believed JH would have difficulty interacting with others due to his concerns regarding vandals and Russians, and the fact that his conversations always turn to those concerns. JH could not identify who the vandals were, and he admitted that he had painted his own windows and some of the words on his home. He also explained that he believed "they" came into his home, tampered with his food, stole

food from him, and vandalized the inside of his home. VRP at 57. JH also believed "they" got ahold of him and did something to his legs that resulted in blood blisters on his calves. *Id.* at 58. This was substantial evidence for the court to find that JH manifested severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control.

There is also substantial evidence that, if released, JH would not receive essential care for his health or safety. Although JH was able to maintain his activities of daily living, he refused medication for both his mental health and hyperthyroidism. In addition, Dr. Collins believed that JH's health had improved "due to the structured setting" provided by the hospital, but that additional stressors out in the community would likely exacerbate his symptoms and "erode his emotional control." VRP at 50. JH himself testified that he was not taking his thyroid medication because he did not believe he needed it, and he stated that obtaining medical treatment in the community was not "at the top of [his] agenda." *Id.* at 59. This was substantial evidence for the trial court to find that JH would not receive essential care for his health and safety.

Therefore, it was not error for the trial court to find that JH was gravely disabled under RCW 71.05.020(24)(b).

## IV.  LESS RESTRICTIVE ALTERNATIVE

JH argues that, even if the trial court properly found that JH is likely to repeat similar acts or is gravely disabled, the State failed to prove that a less restrictive alternative was not in JH's best interest. We disagree.

If the trial court finds that an individual may be committed under RCW 71.05.280, it must also determine whether a less restrictive alternative treatment is in "the best interests of the person or others." RCW 71.05.320(1); *In re Det. of T.A.H.-L.*, 123 Wn. App. 172, 184, 97 P.3d 767 (2004).

9

The State bears the burden of proving that a less restrictive alternative is not in the individual's best interests. *T.A.H.-L.*, 123 Wn. App. at 186.

Dr. Collins explained that JH's treatment team had not identified a less restrictive alternative because JH wished to return to his home, and he did not intend to continue with his mental health treatment. This was consistent with JH's testimony that he preferred to live at home rather than have WSH help him find a new residence, he did not think he needed thyroid medication, and getting medical treatment was not "at the top of [his] agenda." VRP at 59. This was sufficient to persuade the trial court that a less restrictive alternative was not in JH's best interest. Further, the evidence regarding the assaults and JH's likelihood of repeating similar acts was sufficient to persuade the court that a less restrictive alternative was not in the best interest of others. Therefore, it was not error for the trial court to find that a less restrictive alternative was not in the best interest of JH or others.

CONCLUSION

We hold that the trial court did not err by finding that JH presented a substantial likelihood of repeating acts similar to the underlying assaults, that he was gravely disabled, or that a less restrictive alternative was not in the best interest of JH or others. Accordingly, we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

No. 55337-6-II

WORSWICK, J.

We concur:

LEE, C.J.

VELJACIC, J.