# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Detention of: | No. 57620-1-II |
| C.S., | UNPUBLISHED OPINION |
| Appellant. | |

MAXA, P.J. – CS appeals the trial court order extending his involuntary civil commitment under a less restrictive alternative (LRA) for an additional 180 days following a jury trial. He argues that substantial evidence does not support the jury's verdict that he was gravely disabled. We hold that the evidence is sufficient to establish that CS was gravely disabled under RCW 71.05.020(25)(b). Therefore, we affirm the trial court's commitment order.

FACTS

*Background*

CS is a 55-year-old man who has been diagnosed with schizophrenia. Before his current civil commitment, CS had been hospitalized at Western State Hospital (WSH) twice, once in 2003 and once in 2020.

In 2003, CS was convicted of the first degree assault of his then-fiancée. According to CS, he was released from prison for that offense in early 2017.

In 2021, CS was charged with arson after setting fire to a mattress in a motel room. The criminal charge was dismissed without prejudice after the trial court found that CS lacked the

capacity to assist in his defense due to a mental disease and defect and was unlikely to regain competency. CS was sent to WSH for a civil commitment evaluation. On December 13, 2021, the trial court granted the State's petition for 180 days of involuntary inpatient treatment.

In May 2022, a psychologist and a physician at WSH petitioned for an additional 180 days of involuntary treatment and placement in an LRA. The petitioners alleged that CS was gravely disabled as a result of a behavioral health disorder.

CS requested a jury trial. The trial started on July 12. Petitioners Larry Arnholt, Ph.D. and Dr. Karola Kieve and Jenise Gogan, the director of community transitions for the Behavioral Health Administration, testified for the State. CS also testified.

*Dr. Arnholt's Testimony*

Arnholt testified that he was the psychologist for the ward where CS resided between December 2021 and June 2022. Over the seven months preceding the trial, Arnholt had observed CS, consulted other staff, reviewed CS's records, and interviewed CS several times. Arnholt's last interview with CS was five days before Arnholt testified.

Arnholt testified about CS's prior and current hospitalizations and his various diagnoses. He testified that during CS's one month hospitalization in 2003, CS was diagnosed with adjustment disorder with anxiety and personality disorder not otherwise specified with antisocial and narcissistic traits. CS's second hospitalization in 2020 lasted approximately two months. During this hospitalization, he was diagnosed with schizophrenia spectrum disorder. During his current hospitalization, Arnholt diagnosed CS with schizophrenia.

Arnholt explained that a diagnosis can vary and become more apparent as a person ages because their symptoms can progress, particularly if they are on antipsychotic medication and are

inconsistent with medication compliance. He opined that this was likely what happened in CS's case.

Arnholt testified that CS displayed delusional thinking even though he generally was very polite, well spoken, and pleasant and initially could appear to not have any mental health issues. For example, Arnholt testified that during his last interview with CS, CS began displaying delusional thinking about five minutes into the interview. CS told Arnholt "about somebody getting an illuminati shock" and that he had developed "various models of the Rolls Royce automobile." Report of Proceedings (RP) (July 12, 2022) at 44. And in a June 17, 2022 interview, CS asserted that "a poltergeist machine had caused him to have hemorrhoids that caused him to look like one of those monkeys that has a big red butt," claimed that Queen Elizabeth was his boss, and asserted that a "vibe machine" caused him to hear voices. RP (July 12, 2022) at 45-47. Arnholt stated that CS also displayed "a lot of grandiosity." RP (July 12, 2022) at 45.

Arnholt further testified although CS understood that he was at WSH because he had set a fire, during his last interview CS stated that Mariah Carey, Janet Jackson, the FBI, and the CIA had "conspir[ed] to cause him to light [the] fire that got him in trouble." RP (July 12, 2022) at 44. Arnholt testified that the fact CS's delusions caused him to act by setting a fire was "particularly concerning." RP (July 12, 2022) at 44.

Arnholt also stated that CS had displayed some concerning behavior during his current hospitalization. In February 2022, CS had a misunderstanding with another patient that led to a physical altercation. Arnholt opined that given CS's history of grandiosity and other factors, he believed "that there are elements of paranoia that would have contributed to the altercation." RP (July 12, 2022) at 50. Arnholt also mentioned another incident in February that almost became

physical but staff intervened. But Arnholt admitted that CS had not been in any altercations since April despite having been physically provoked.

Arnholt testified that CS currently was receiving a monthly injection and that CS believed that the medication kept him calm. But Arnholt stated that CS believed his delusions were real and did not understand that his mental health condition caused his delusional beliefs.

Arnholt opined that CS would be able to meet his essential needs of health and safety "for a period of time" if he were to be released. RP (July 12, 2022) at 51. But given CS's history, Arnholt was concerned that even if CS remained compliant with his medication, he could deteriorate "as a result of the natural progression" of his condition and stress. RP (July 12, 2022) at 51. Unless he was being observed and assessed he might act on his delusional ideas, as he did when he set the fire. Arnholt expressed concern that CS's condition would progress in light of his history, which showed that each of CS's subsequent hospitalizations had been for longer periods of time and he appeared "to be a little bit more profoundly delusional" each time. RP (July 12, 2022) at 52.

Arnholt also stated that whether CS would remain compliant with his treatment if released would depend on "the stability of his disorder." RP (July 12, 2022) at 80. Arnholt opined that an LRA could provide the structure and medication required to keep CS stable.

When discussing CS's proposed release plans, Arnholt testified that CS stated that he would go to a homeless shelter. This plan concerned Arnholt because this plan would not provide CS with a consistent place to stay, the environment would be stressful, and the environment would not provide CS with any support. Arnholt testified that if CS was simply released and not placed in an LRA, it "would be too risky that he would not be able to get his

medication, his condition would exacerbate," and there was a chance the he could become homeless and difficult to locate. RP (July 12, 2022) at 55.

Arnholt opined that CS would do well in a least restrictive alternative, such as a group home or supported apartment setting, where they could ensure he had a good place to stay, had mental health follow ups, and took his monthly injection so his condition did not deteriorate. But without that kind of support, Arnholt was concerned that CS's "pronounced delusional system" would make him anxious and suspicious and that this could lead to altercations or him acting on his delusions as he did when he started the fire. RP (July 12, 2022) at 52.

*Dr. Kieves' Testimony*

Kieves testified that she had regular daily contact with CS from January 2022 until he was transferred to a different ward on in June. She last met with CS five days before the trial.

Kieves agreed with Arnholt's schizophrenia diagnosis. She noted that CS had voluntarily agreed to take a long-acting injectable medication. Kieves testified that although fixed delusions do not go away when a patient is treated with antipsychotic medication, the medication does "improve[ ] a person's demeanor and their reactivity to things." RP (July 12, 2022) at 115. And the medication had helped CS in that respect.

Kieves testified that CS was well liked on the ward. Although she first wondered why CS was at the hospital during their first encounter, after a brief conversation with CS it became apparent that he suffered from several delusional beliefs. For instance, he believed that he was working for Queen Elizabeth, that he was fashion designer Roberto Cavalli, that his father was "Mr. Rockefeller" of New York City, and that he owned WSH and several other buildings.

Kieves testified that CS also believed that he was being wrongfully detained and that he was outraged that he was being held in WSH as a psychiatric patient. When Kieves spoke with

5

CS about why he was at WSH, he told her that it had to do with some kind of conspiracy involving Janet Jackson, Britney Spears, the CIA, and the FBI. CS never mentioned the fire that had resulted in his eventual commitment. Kieves considered CS to have paranoia issues because he believed his hospitalization was the result of a conspiracy.

Kieves acknowledged that before CS started receiving his monthly injections, he had been more volatile and angrier and that CS had become more relaxed over the past three months. When asked if CS would retain the gains he had made if he were to be released, Kieves responded that she believed he would not. She opined that if CS were to be released to a homeless shelter or an apartment where he did not receive any assistance "negotiat[ing] day-to-day life . . . in the presence of [his] very fixed delusions," he would get angry and be arrested again if someone challenged his delusions. RP (July 12, 2022) at 95.

Kieves testified about two incidents earlier in the year in which CS had become aggressive. In February 2022, CS became frustrated and angry when a nurse would not give him his breakfast when he got up late. In addition, CS struck someone in the mouth after that person had interrupted a conversation CS was having with another man in the dining room and the situation escalated.

Kieves also testified about an incident that occurred on June 16, 2022, less than a month before the trial, in which CS left a face-to-face meeting with his counsel in an agitated state. Upon leaving the meeting, CS asserted that counsel did not know the law. CS also stated that he was "a spy for Queen Elizabeth," that WSH had no jurisdiction over him, and that he was being detained illegally. RP (July 12, 2022) at 107. And CS stated, "All of you are going to pay. I'm going to catch a murder case." RP (July 12, 2022) at 107. Kieves testified that "catching a murder" meant "getting arrested for murder." RP (July 12, 2022) at 138.

6

After making this comment, CS declined medication to help him calm down and was loud and agitated until he went to dinner an hour later. At his subsequent medication time, he told a nurse that he was not taking any more medication and to "[p]ass that along." RP (July 12, 2022) at 107. But Kieves acknowledged that CS had since received another dose of his monthly medication despite that comment.

Kieves opined that CS's June 16 behavior was a reaction to his counsel confronting him, and she commented that confronting someone who has fixed delusions such as CS could result in an aggressive response such as the one CS displayed. She was concerned because "people on the outside" would not understand this risk. RP (July 12, 2022) at 127.

Because of the June 16 incident, Kieves was concerned about discharging CS into the community because it demonstrated that if he was angry or under stress he tended to decompensate. Kieves also stated that CS's statement that he would refuse medication was concerning because, although he understood the medication calmed him down, he did not believe that he had a mental illness and had no insight as to why he needed to keep taking the medication. Kieves believed that it was possible that CS was just going along with the medication to appease the staff. Kieves opined that if CS stopped receiving his medication he would react to the first person who frustrated him, questioned him, or was disrespectful.

Despite CS's condition, Kieves testified that CS had been able to take care of his activities of daily living. Therefore, an LRA would be appropriate.

*Gogan's Testimony*

Gogan testified that she met with CS at the hospital while gathering patient feedback on a website project she was working on. She spoke to CS about his feedback, and he asked her questions about an interstate compact and the legality of his civil commitment.

During their conversation, CS mentioned that his father was Robert Rockefeller of New York and said that he wanted an interstate transfer to New York. CS also made requests to be deported to England, asserting that he was a member of the CIA and the British Secret Intelligence Service and had some type of relationship with the Queen.

Gogan testified that CS's placement case was complex in light of his arrest for the arson and his prior assault conviction. His placement was further complicated by his desire for a transfer to New York.

Given CS's history, Gogan opined that he would need an LRA. She also testified that his statements to her demonstrated he had grandiose delusions and that when people experience such delusions it can lead to them not believing that they need medication, stopping their medication, or trying to access the people with whom they have delusional connections.

*CS's Testimony*

CS initially testified that if he was discharged he planned to get housing in Vancouver, near family in Portland, and planned to look for work with his former boss. He also testified that he planned to keep taking his injectable medication because he did not want to "deteriorate" and he had been told that his "brain [would] start going whacky" if he stopped his medication. RP (July 13, 2022) at 80. In addition, he stated that he anticipated continuing his medication through one of three health organizations in Vancouver that could provide medication administration and oversight. He testified that he had worked with one of these organizations five and a half years ago when he had been released from prison after serving his sentence for the assault.

But when his counsel asked him what he wanted the jury to know about his job, CS testified that he had been working as a secret double agent for Queen Elizabeth since 2003. He

stated that he intended to leave the country and go to England because he had given up his citizenship when he became a secret agent and his father (Rockefeller), George Bush, Dick Chaney, and a lady at the Pentagon had warned him that his life was in danger and that the "feds" were trying to kill him. RP (July 13, 2022) at 93. He asserted that he had a residence in England and that he would get his medication through the royal family's doctor. He also testified that he wanted Rockefeller to be involved in his treatment.

When asked how he planned to contact Queen Elizabeth, CS responded that he had not been in contact with her since he was falsely convicted of assault in 2003. He then discussed how the assault charge was a trumped up charge and stated that he previously had talked to Queen Elizabeth, his father (Rockefeller), George Bush, and Dick Cheney during a conference call about the assault charge. CS asserted that the most he should have been charged with was third degree domestic violence assault because he had only slapped his fiancée and had not hit her with a hammer. And he stated that Charles Campbell, an FBI investigator with ties to the Clark County jail, had "put [a] probe up in [him]" and that others had assaulted his fiancée with a hammer and had sexually assaulted him. RP (July 13, 2022) at 91. He then stated that he might call Rockefeller, Queen Elizabeth, George Bush, Dick Cheney, and Prime Minister Tony Blair as expert witnesses.

*Verdict and Order*

The jury found that CS had a behavioral health disorder and that he was gravely disabled as a result of this behavioral health disorder. The jury also found that an LRA was in CS's best interest. The trial court entered an order extending CS's involuntary treatment for up to 180 days. The court also ordered that arrangements be made for a placement in an LRA.

CS appeals the jury verdict that he was gravely disabled and the trial court's commitment order.

ANALYSIS

CS argues that the evidence is insufficient to support the jury's gravely disabled verdict under RCW 71.05.020(25)(b)[1] because the State failed to present evidence that he manifested severe deterioration in routine functioning and would not be able to provide care that was essential for his basic welfare.[2] We disagree.

A.    LEGAL PRINCIPLES

RCW 71.05.320(4) provides that after an initial involuntary commitment period, the professional person in charge of the facility in which a person is committed may file a new petition for involuntary treatment on various grounds. Relevant here, a new petition may be filed on the ground that the person continues to be gravely disabled. RCW 71.05.320(4)(d). "Gravely disabled" is defined as:

> a condition in which a person, as a result of a behavioral health disorder: (a) Is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

RCW 71.05.020(25).

---

[1] The legislature amended this statute in 2022 and 2023. Because these amendments did not change the relevant subsection, we cite to the current version of the statute.

[2] CS also argues that the evidence was insufficient to establish that he was gravely disabled under RCW 71.05.020(25)(a), which required the State to prove that he was "in danger of serious physical harm resulting from a failure to provide for his . . . essential human needs of health or safety." The State concedes that the evidence was insufficient to establish grave disability under RCW 71.05.020(25)(a). Therefore, we do not address this issue.

When a petitioner seeks to prove that a person is gravely disabled under RCW 71.05.020(25)(b), they must show (1) "recent proof of significant loss of cognitive or volitional control" and (2) "a factual basis for concluding that the individual is not receiving or would not receive, if released, such care as is essential for [their] health or safety." *In re Det. of LaBelle*, 107 Wn.2d 196, 208, 728 P.2d 138 (1986). The second requirement may include a showing that "the individual is *unable*, because of severe deterioration of mental functioning, to make a rational decision with respect to [their] need for treatment." *Id.*

In a civil commitment proceeding, the State has the burden of proving that a person is gravely disabled by clear, cogent, and convincing evidence. RCW 71.05.310. This standard means that the State must show that the ultimate fact in issue is "highly probable." *Labelle*, 107 Wn.2d at 209. On appeal, we will not disturb the jury's grave disability verdict if it is supported by substantial evidence that the jury could reasonably have found to be clear, cogent, and convincing. *See id.* (addressing the standard of review for a bench trial). And for a sufficiency of the evidence challenge, we view the evidence in the light most favorable to the State. *See In re Det. of B.M.*, 7 Wn. App. 2d 70, 85, 432 P.3d 459 (2019).

B.    SUFFICIENT EVIDENCE UNDER SUBSECTION (b)

Viewing the evidence in the light most favorable to the State, we conclude that the evidence presented would allow the jury to find by clear, cogent, and convincing evidence that CS showed a recent loss of cognitive control due to a behavioral health disorder.

The evidence that CS recently started a fire in response to his delusional thinking and his testimony that he planned to depart for England after his release and obtain medical care from Queen Elizabeth's royal family doctor demonstrates a recent lack of cognitive control. In addition, the evidence that CS became agitated to the point of threatening to murder people and

11

stop his medications when he was challenged by his counsel during a meeting less than a month before the hearing on the petition demonstrates a recent lack of cognitive control. And this lack of cognitive control clearly was linked to the delusions that are part of his behavioral health disorder.

Viewing the evidence in the light most favorable to the State, we also conclude that the evidence would allow the jury to find by clear, cogent, and convincing evidence that CS would not receive the care essential for his health or safety if released.

CS's treatment providers testified that CS's release plan was to go to a shelter and to continue his monthly treatment from one of three local health organizations. But they also testified that this plan was not sufficient because the shelter environment was unstable. And they testified that there was a real risk that even if CS remained compliant with his medication his condition would decline due to stress or his condition's natural progression if he was not properly monitored or supervised.

In addition, although CS testified that he planned to live at a homeless shelter and that he could arrange for treatment at one of three providers, he also testified that he intended to leave the area to be with Queen Elizabeth in England and that he would seek treatment through the royal family doctor. Because there was evidence that in the past CS had acted on his delusional thinking, this evidence demonstrates that CS's condition could interfere with his ability to seek appropriate shelter and care.

Finally, the State presented evidence establishing that CS did not believe he had a behavioral health disorder. And although CS understood his medication calmed him, he believed that his fixed delusions were true, demonstrating that he had no insight into his behavioral health condition. This evidence that CS did not understand his condition or the fact his medication

12

treated the condition makes it highly probable that CS would not be able to make a rational choice about his treatment.

The evidence is sufficient to establish (1) a recent proof of loss of cognitive or volitional control due to a behavioral health disorder, and (2) CS would not receive essential care for his health or safety if he was released. Therefore, we hold that substantial evidence supported the jury's verdict.

## CONCLUSION

We affirm the trial court's commitment order.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

MAXA, P.J.

We concur:

VELJACIC, J.

CHE, J.