# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Detention of: | No. 85176-4-I |
| C.C., | DIVISION ONE |
| Appellant. | UNPUBLISHED OPINION |

FELDMAN, J. — C.C. appeals a 14-day commitment order under the Involuntary Treatment Act, ch. 71.05 RCW. She asserts there is insufficient evidence to support the trial court's determination that she was "gravely disabled" and could therefore be detained for up to 14 days of involuntary treatment. Because sufficient evidence supports the trial court's determination, we affirm.

I

C.C. moved into the Pat Williams Apartments (Pat Williams) in February 2022. During C.C.'s first three months at Pat Williams, she was described as quiet, nice, helpful, and generally engaged with other residents. After three months, C.C.'s mental health began to show signs of decompensation. C.C. began threatening other tenants and staff by yelling that "she was going to kill people; she was going to sue people. . . . that she's got cases against them." During this time, Pat Williams staff members also noticed that C.C. had lost a significant amount of

weight.  C.C. later acknowledged, "I've lost over 100 pounds because I have anorexia."

On February 27, 2023, Pat Williams staff called 911 to report that C.C. was threatening to kill other residents and staff members.  Police responded to the call and detained C.C. for evaluation by a designated crisis responder (DCR) at Harborview Medical Center's Psychiatric Emergency Services Unit (Harborview PES).  The DCR determined that C.C. should be placed on a 120-hour involuntary hold for further evaluation and treatment.  Harborview PES then transferred C.C. to Navos Behavioral Health Hospital (Navos).  Navos, in turn, determined that C.C. required further evaluation and treatment beyond the 120-hour involuntary hold, and so it filed a petition for an additional 14 days of involuntary treatment based on grave disability under RCW 71.05.240(4)(a) and former RCW 71.05.020(24)(a) (2023),[1] which are quoted and discussed below.[2]

Pursuant to RCW 71.05.240, a King County Superior Court commissioner held a probable cause hearing on March 7, 2023 to determine whether C.C. should be detained for up to an additional 14 days of involuntary treatment.  Four witnesses testified at the hearing: (1) Donna Bland, the lead residential specialist at Pat Williams, testified regarding C.C.'s behavior and mental state during her time there; (2) David Rodriguez, C.C.'s case manager at Pat Williams, testified regarding C.C.'s behavior on February 27, 2023 leading to her hospitalization at

---

[1] All citations to RCW 71.05.020 are to the provisions in effect at the time of C.C.'s hearing, former RCW 71.05 (2023).  LAWS of 2012, ch. 256, § 8 (effective May 1, 2012).
[2] Although Navos also alleged risk of harm to others under former RCW 71.05.020(36)(a) (2022) and grave disability under former RCW 71.05.020(24)(b), those allegations have since been voluntarily dismissed.

Harborview PES; (3) Martin Buccieri, a physician assistant at Harborview PES, testified regarding the hospital staff's observations of C.C.'s decompensated mental state and behavior while detained there; and (4) Kassandra Sparkmon, a mental health counselor at Navos, testified that C.C. has a working diagnosis of schizoaffective disorder and described the impact of that disorder on C.C.'s ability to provide for her essential needs. The commissioner also heard argument from both parties.

At the conclusion of the hearing, the commissioner ruled as follows:

> The evidence does establish through Ms. Sparkmon's testimony, which is supported by the testimony of Mr. Rodriguez, Ms. Bland, and Mr. Buccieri that [C.C.] does suffer from a behavior health disorder. She has a working diagnosis of Schizoaffective Disorder.
>
> This behavioral health disorder has had a substantial adverse effect upon [C.C.'s] cognitive and volition of functioning and as a result of this behavior, . . . [C.C.] is gravely disabled and at substantial risk of harm due to her inability to provide for her own essential needs of health and safety and would not receive care outside the hospital essential to her health and safety. Her behavioral health disorder is interfering with her ability to make a reasonable, rational decision about her treatment.

The commissioner subsequently entered a written ruling that both supplemented and incorporated the above findings. C.C. then filed a motion for revision of the commissioner's ruling. The trial court affirmed the commissioner's findings and conclusions, adopted them as its own, and denied C.C.'s motion. This timely appeal followed.

II

C.C. asserts there is insufficient evidence to support the trial court's determination that she was "gravely disabled" under RCW 71.05.240(4)(a) as required to detain her for up to 14 days of involuntary treatment. We disagree.

The Involuntary Treatment Act (ITA), ch. 71.05 RCW, states in relevant part as follows:

> [I]f the court finds by a preponderance of the evidence that a person detained for behavioral health treatment, as the result of a behavioral health disorder, . . . is gravely disabled, and, after considering less restrictive alternatives to involuntary detention and treatment, finds that no such alternatives are in the best interests of such person or others, the court shall order that such person be detained for involuntary treatment not to exceed 14 days in a facility licensed or certified to provide treatment by the department or under RCW 71.05.745.

RCW 71.05.240(4)(a). Thus, under the ITA, a person may be involuntarily detained for up to 14 days of treatment if they are "gravely disabled."

Relevant here, former RCW 71.05.020(24)(a) defines "gravely disabled" as "a condition in which a person, as a result of a behavioral health disorder . . . [i]s in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety." To establish grave disability under this statutory provision, the Petitioner must prove both "recent, tangible evidence of failure or inability to provide for . . . essential human needs" and that "the failure to meet these needs placed [the person] 'in danger of serious physical harm.'" *In re Det. of A.M.*, 17 Wn. App. 2d 321, 334, 487 P.3d 531 (2021) (*quoting In re Det. of LaBelle*, 107 Wn.2d 196, 204-05, 728 P.2d 138 (1986); former RCW

71.05.020(22)(a) (2018)). Essential human needs, in turn, include "food, clothing, shelter, and medical treatment." *LaBelle*, 107 Wn.2d at 204-05.

The trial court concluded that C.C., "as a result of a behavioral health disorder, is gravely disabled" under RCW 71.05.240(4)(a). On review, we must determine "whether substantial evidence supports the [trial court's] findings, and, if so, whether the findings in turn support the trial court's conclusions of law and judgment." *LaBelle*, 107 Wn.2d at 209. "Substantial evidence is the quantum of evidence sufficient to persuade a fair-minded person" that the premise is true. *In re Det. of H.N.*, 188 Wn. App. 744, 762, 355 P.3d 294 (2015). This is a deferential standard of review: "we consider the evidence in the light most favorable to the Petitioners," which in this case is Navos. *A.M.*, 17 Wn. App. 2d at 330 (*citing In re Det. of B.M.*, 7 Wn. App. 2d 70, 85, 432 P.3d 459, *review denied*, 193 Wn.2d 1017, 444 P.3d 1185 (2019)).

Substantial evidence supports the trial court's finding that C.C. was "gravely disabled." Mr. Rodriguez testified that while C.C. was at Pat Williams, she would yell that she is going to kill people and this behavior continued to occur frequently up to the day C.C. was taken to Harborview PES. Ms. Sparkmon similarly testified that while C.C. was hospitalized at Navos, she refused to take her medication, denied having any mental health issues, refused treatment that her medical care providers recommended, refused to consult with a counselor, and continued to exhibit symptoms of schizoaffective disorder, including grandiose delusions. Multiple witnesses also confirmed that C.C. had "lost a lot of weight." C.C. likewise acknowledged "I've lost over 100 pounds because I have anorexia." But while C.C.

claimed that her significant weight loss was caused by anorexia, no one at Navos diagnosed her with anorexia, and she exhibited a normal appetite while hospitalized there. This evidence is enough to persuade a fair-minded, rational person that C.C. "as a result of a behavioral health disorder . . . [i]s in danger of serious physical harm resulting from a failure to provide for . . . her essential human needs of health or safety" and was therefore "gravely disabled" under former RCW 71.05.020(24)(a).

C.C. does not dispute that she has a behavioral health disorder with a working diagnosis of schizoaffective disorder, as the trial court here found. Instead, she asserts that her condition was "the same" for almost a year before she was hospitalized and there is insufficient evidence that she was unable to provide for her essential human needs as a result of her behavioral health disorder. Relatedly, C.C. claims that there is insufficient evidence to support the trial court's finding that she "would not receive care outside the hospital that is essential to her health and safety." She cites *LaBelle,* 107 Wn.2d at 217, in support of this argument and emphasizes that the court there "found insufficient evidence that one appellant . . . would fail to feed himself." But as *LaBelle* confirms, "essential human needs" includes medical treatment as well as food, clothing, and shelter. *Id.* at 204-05. Even if C.C. had sufficient food, clothing, and shelter, she had refused medication because she believed she was "being poisoned" by the medication and because she did not believe that she needed medical treatment. This evidence supports the trial court's determination that C.C. was in danger of serious physical harm as a result of her behavioral health disorder, and was

therefore "gravely disabled" under former RCW 71.05.020(24)(a), because she "would not receive care outside the hospital that is essential to her health and safety."

Next, C.C. asserts that insufficient evidence supports the trial court's finding that she "refused to get any follow up care or treatment" for anorexia. In support of this argument, C.C. cites *A.M.*, 17 Wn. App. 2d at 334, where the court held that "[t]here was no evidence of past or recent weight loss or any other health consequence from AM's reluctance to eat or any ability to meet his ADLs [activities of daily living]." Here, in contrast, such a danger was manifest. Although C.C. self-reported that she had seen an outpatient counselor for her anorexia, there is no evidence C.C. received such treatment. And while C.C. claims that her weight loss was caused by anorexia, she exhibited a normal appetite while hospitalized at Navos. Additionally, Ms. Sparkmon testified, "Anorexia not only causes weight loss, but other bodily harm as well, including with your heart," and yet C.C. refused testing to determine if she has any heart problems arising from her weight loss. This evidence, in addition to the evidence that is described above, supports the trial court's determination that C.C. was gravely disabled.

Lastly, the trial court's analysis is also consistent with controlling case law. For example, in *In re the Detention of R.H.*, 178 Wn. App. 941, 947, 316 P.3d 535 (2014), the court determined, "R.H. was gravely disabled because . . . he was unable to obtain medical treatment sufficient to remain mentally stable unless involuntarily hospitalized." Similarly, in *In re the Detention of A.F.*, 20 Wn. App. 2d 115, 127-28, 498 P.3d 1006 (2021), the court determined A.F. was gravely

- 7 -

disabled because "his bipolar symptoms that relate to delusional thought and lack of volitional control, prevented A.F. from seeking out and obtaining appropriate care." As in *R.H.*, there is substantial evidence that C.C. would not receive medical treatment sufficient to remain mentally stable unless involuntarily hospitalized. And similar to *A.F.*, there is evidence that C.C. would not engage in any meaningful conversation regarding her outpatient mental health treatment options with the staff at Harborview PES or Navos. As these cases confirm, substantial evidence supports the trial court's determination that C.C. was "gravely disabled" and could therefore be detained for up to 14 days of involuntary treatment.

Affirmed.

Feldman, J.

WE CONCUR:

Díaz, J.

Coburn, J.