IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Detention of<br><br>T.R.L.,<br><br>        Petitioner. | No. 87118-8-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUNG, J. — A court commissioner ordered T.R.L. involuntarily committed for treatment for up to 14 days according to the Involuntary Treatment Act (ITA), chapter 71.05 RCW. In issuing its order, the commissioner found that T.R.L. was gravely disabled because she was in danger of serious physical harm that resulted from her failure to provide for her essential health and safety needs. T.R.L. challenges her commitment, contending there was not substantial evidence to support the findings and that the commissioner erred in concluding she was gravely disabled. We disagree and affirm.

FACTS

T.R.L., a 56-year-old female, was admitted to St. Anne Hospital on July 13, 2024, for a mental health evaluation. T.R.L. had been released from jail five days prior to her admission to St. Anne.

T.R.L. was brought to St. Anne by the King County Sheriff after she had been knocking on doors at an apartment complex, entered a stranger's apartment, and

refused to leave. T.R.L. reportedly was unable to identify herself, screamed at the responding police officers and asked "the deputy to murder her." According to T.R.L.'s medical records, upon admission to St. Anne, T.R.L. appeared tearful and was " 'making nonsensical statements.' " The hospital ran a urinalysis and detected ketones. While at St. Anne, T.R.L. was administered various medications including Haldol and Benadryl. Various hospital staff attempted to engage with T.R.L. on the date of her admission, but she "did not answer when asked various questions," and when she did answer, she told staff, " 'I don't have a name. I don't have a birthday.' " T.R.L. also reportedly told hospital staff that she was homeless. The records also noted that T.R.L. "started to play with the [feces] that she found in the [emergency department] washroom."

On July 14, 2024, Allison Ankney, a designated crisis responder, filed a petition for T.R.L.'s initial detention, alleging T.R.L. posed an imminent likelihood of serious harm to others and was in imminent danger due to grave disability and that no less restrictive alternative was available. The petition sought to detain T.R.L. for an initial period of 120 hours to evaluate and treat her. Aurora Casteel, a licensed social worker, filed a declaration in support, stating that at her evaluation, T.R.L. presented with "symptoms including: labile speech oscillating from mutism to hyperverbal disorganized/nonsensical speech, disorganization, paranoia, verbal aggression, irritability, delusion[]." For example, hospital notes indicate that T.R.L. poured cold water all over a nursing assistant and stated that she was "falling in love with a man that she married yesterday but [that] he never came back."

2

On July 16, T.R.L. was transferred to Fairfax Behavioral Health. A commitment hearing was scheduled for July 19, 2024. However, after the initial 120-hour hold, on July 19, Brian Hayden, a licensed mental health counselor (LMHC) at Fairfax, signed a petition for a 14-day involuntary treatment detention. The petition was also signed by an advanced registered nurse practitioner. The petition alleged that T.R.L. was suffering from a mental disorder that impacted her cognitive and volitional functions to the extent that she posed a likelihood of serious harm to others and that she was gravely disabled. In particular, the petition stated that T.R.L. had been diagnosed with "Schizoaffective Disorder Bipolar Type" and had been previously "hospitalized at Fairfax" from February 11, 2023 through March 3, 2023.[1] The petition alleged that even after the initial hold, T.R.L. was "showing an increased loss of cognitive and volitional functioning, [and] poor insight regarding symptoms." Further, the petition claimed that a less restrictive alternative was not in the best interest of T.R.L. because she "requires the monitoring and stabilization of an inpatient psychiatric hospital."

A hearing was held on August 7 and 8, 2024, before a commissioner of King County Superior Court. At the hearing, Fred Schwartz, a court evaluator and LMHC, testified that he evaluated T.R.L., and that he had a working diagnosis for T.R.L. of schizoaffective disorder bipolar type, which impacted her cognitive and volitional functions, caused her to be gravely disabled, and put her in a serious risk of harm for failing to provide for her health and safety needs. Schwartz also testified that she was

---

[1] Testimony that T.R.L. had been "previously hospitalized at Fairfax in March [2023] where she presented with similar psychiatric symptoms," at which time she was eventually discharged on a less restrictive treatment order.

currently displaying symptoms of "delusional, grandiose, discharged focus," and that when he attempted to discuss discharge planning, T.R.L. gave "delusional housing arrangements," such as saying that she had a house in Burien "that they built for her," although upon verification, it was determined she was never an occupant of that building. Schwartz also testified that T.R.L. told him that "she could go to her sister's home to live and she would walk from the hospital [in Kirkland] to Auburn," but that the hospital was unable to get in touch with T.R.L.'s sister. Schwartz concluded that the presence of ketones in T.R.L.'s urine, her urinary tract infection, and other medical problems at the time of her admission to the hospital were "an indication of poor self-care" and she did not have "any outpatient services that we've been able to identify and she currently has no family support." As such, Schwartz concluded that T.R.L. was gravely disabled.

The commissioner found by a preponderance of the evidence that T.R.L. "currently suffers from a behavioral health disorder (working diagnosis: schizoaffective disorder bipolar type)," which "had a substantial adverse effect upon [her] cognitive and volitional functioning." Further, it found by a preponderance of the evidence that due to her mental health diagnosis, pursuant to RCW 71.05.020(25)(a), T.R.L. was "in danger of serious physical harm from a failure or inability to provide for her essential needs of health and safety" and that her mental health diagnosis also "interfer[ed] with her ability to make a reasonable, rational decision about her treatment." Further, the commissioner explained that while T.R.L. "shows some improvement," it was "limited improvement and it's certainly not enough to be released at this time because she does continue to exhibit active symptoms of her behavior[al] health disorder," and while in the hospital, T.R.L.

was not able to "meaningfully engage in conversation or discharge planning." Therefore, the commissioner found that pursuant to RCW 71.05.240, a less restrictive treatment order was "not appropriate nor in [her] best interests because she has not stabilized, is still exhibiting active symptoms of her behavioral health disorder, and is too symptomatic to meet her needs in a less restrictive setting." Ultimately, it ordered T.R.L. be involuntarily detained for treatment for a period not to exceed 14 days at Fairfax Hospital.

T.R.L. timely appeals.[2]

DISCUSSION

T.R.L. challenges the commissioner's ultimate conclusion that she was gravely disabled as defined by RCW 71.05.020(25)(a) and must be involuntarily detained for treatment, as well as the underlying findings of fact. In particular, T.R.L. argues that the State failed to prove she was gravely disabled at the time of the hearing and instead, improperly based its determination on her mental health diagnosis. We disagree.

On appeal, we review whether substantial evidence supports a trial court's findings of fact and, if so, whether those findings support its conclusions of law. In re Det. of LaBelle, 107 Wn.2d 196, 209, 728 P.2d 138 (1986). Substantial evidence is "the quantum of evidence 'sufficient to persuade a fair-minded person of the truth of the declared premise.' " In re Det. of K.P., 32 Wn. App. 2d 214, 221, 555 P.3d 480 (2024)

---

[2] In her opening brief, T.R.L. argues that her petition was facially invalid because the State failed to follow the procedure pursuant to RCW 71.05.290 requiring a petition be supported by two affidavits that each describe the person's behavior and indicate the affiant's willingness to testify to such facts. However, as the State points out, RCW 71.05.230 applies to T.R.L.'s 14-day involuntary detention for treatment, whereas RCW 71.05.290 provides the procedure for a petition for *additional* commitment following a 14-day treatment period. T.R.L. concedes this point in her reply brief.

(quoting In re Det. of H.N., 188 Wn. App. 744, 762, 355 P.3d 294 (2015)). We review substantial evidence claims in the light most favorable to the State. In re Det. of B.M., 7 Wn. App. 2d 70, 85, 432 P.3d 459 (2019).

Under the ITA, a person may be involuntarily committed for treatment of behavioral health disorders.[3] LaBelle, 107 Wn.2d at 201-02. However, a behavioral health disorder alone is not enough to permit the significant deprivation of liberty encompassed by commitment order for involuntary treatment. Id. at 201. A court can order commitment for involuntary treatment if the person poses a likelihood of serious harm or is gravely disabled. RCW 71.05.240(4)(a).

Here, the trial court concluded that T.R.L. was gravely disabled as defined by RCW 71.05.020(25)(a). This subsection defines a person as "gravely disabled" if "as a result of a behavioral health disorder[,] [the person] (a) is in danger of serious physical harm resulting from a failure to provide for [their] essential human needs of health or safety." RCW 71.05.020(25). RCW 71.05.020(25)(a) requires the State to demonstrate tangible evidence that the "individual has failed or is unable to provide for essential needs such as 'food, clothing, shelter and medical treatment which presents a high probability of serious physical harm within the near future unless adequate treatment is afforded.' " In re Det. of A.F., 20 Wn. App. 2d 115, 126, 498 P.3d 1006 (2021) (quoting LaBelle, 107 Wn.2d at 204-05). The State must also prove that the person's failure or inability to provide for their essential needs "arise[s] as a result of [their] mental

---

[3] A "behavioral health disorder" is defined as "either a mental disorder as defined in this section, a substance use disorder as defined in this section, or a co-occurring mental disorder and substance use disorder." RCW 71.05.020(8). A "mental disorder" is defined as "any organic, mental, or emotional impairment which has substantial adverse effects on a person's cognitive or volitional functions." RCW 71.05.020(39).

6

disorder." LaBelle, 107 Wn.2d at 205. However, a court should not impose "majoritarian values on a person's chosen lifestyle which, although not sufficiently harmful to justify commitment, may be perceived by most of society as eccentric, substandard, or otherwise offensive." Id. at 204.

Here, "[b]ased on the credible testimony of Fred Schwartz, the court evaluator," the commissioner found by a preponderance of the evidence that T.R.L. had a behavioral health disorder, which "has had a substantial adverse effect upon [her] cognitive and volitional functioning as evidenced by her symptoms and presentation."[4] This finding was supported by Schwartz's testimony that his working diagnosis for T.R.L. was that she had schizoaffective disorder bipolar type, which impacted her cognitive and volitional functioning. The commissioner also found that T.R.L. was "delusional, grandiose, disorganized, confused, isolative, demonstrating poor processing, and showing impaired insight and judgment." The record supports this finding as well, as Schwartz testified that T.R.L. was currently displaying symptoms of "delusional, grandiose, discharged focus." The commissioner also stated that a person's inability to engage in a "reality based conversation" can support a gravely disabled finding, and it found this was the situation with T.R.L.[5] Relying in part on "the credible testimony" of Song, St. Anne's proxy witness as custodian of records, the commissioner found that T.R.L. was unable to identify herself and threatened hospital staff. Several

---

[4] Schwartz, an LMHC and Fairfax Hospital's court evaluator, based his opinion on his evaluation of T.R.L., a process that included "consider[ing] the medical record, consult[ing] with the treatment team, [listening to] the testimony . . . , the initial tension packet, [and his] observation and conversation with [T.R.L.]."

[5] The court cited In re Det. of Kinta Hollins, an unpublished case, to support this proposition. No. 70605-5-I, slip op. at 1-10 (Wash. Ct. App. Aug. 4, 2014) (unpublished), https://www.courts.wa.gov/opinions/pdf/706055.pdf.

chart notes, which Song read into evidence, support this finding. T.R.L. reportedly stated, " ' I will martyr your family. I will eat your babies' " and " 'put that mask on before you spit in my food . . . I'll fuck you up if you do.' " Another chart note stated that T.R.L's "behavior is very unpredictable and labile," and that she refused to give staff her name or date of birth, responding instead, " 'I don't have a name. I don't have a birthday.' "

The commissioner also found by a preponderance of the evidence that T.R.L. was in danger of serious physical harm due to "a failure or inability to provide for her essential needs of health and safety." Specifically, the commissioner found that T.R.L. had "ketones in her urine, and she was observed to fill a cup and basi[n] with dirty toilet water and a previous patient's feces with her bare hands." This finding was supported by chart notes that stated that T.R.L. "fill[ed] [a] cup and basin with dirty toilet water and a previous patient's feces," "us[ed] bare hands to handle feces," and "started to play with the stool that she found in the [emergency department] washroom." Further, the commissioner found that the fact that T.R.L. was "diagnosed with hyponatremia and a urinary tract infection" demonstrated her inability to care for her essential needs and that she was "unable to meaningfully engage in conversation or discharge planning." This finding was supported by Schwartz's testimony that the presence of ketones in T.R.L.'s lab results, a urinary tract infection (UTI), hyponatremia, and "other things that [he] had read into the record" were "indication[s] of poor self-care."

T.R.L. argues that despite evidence that she had hyponatremia and ketones in her urine, the State did not provide evidence to explain "if or how these findings were related to [her] alleged behavioral health disorder." In particular, she argues that there

was no other evidence that she was receiving medical intervention or treatment to address these issues.

But T.R.L. ignores Schwartz's testimony that she "had significant medical problems that were being treated in the hospital, [and] ketones was one indication," along with her UTI and other documented problems, of "poor self-care." A patient's failure to obtain care due to an inability to articulate how they manage their needs and their behavioral health disorder can support finding that the patient is gravely disabled according to RCW 71.05.020(25)(a). See A.F., 20 Wn. App. 2d at 126-27; see also In re Det. of A.M., 17 Wn. App. 2d 321, 333-35, 487 P.3d 531 (2021) (to find a person gravely disabled for failure to provide for their own nutritional needs, the State needed to show that this failure is, or could be, harmful to the person). For example, in A.F. the reviewing court concluded that the trial court's finding that the patient was gravely disabled was supported by substantial evidence. 20 Wn. App. 2d at 127. Specifically, the patient did not acknowledge his need for care and could not explain how he planned to address his mental and physical care needs. Id. Further, the court noted that the patient's behavioral health disorder "symptoms that relate to delusional thought and lack of volitional control, prevented [him] from seeking out and obtaining care." Id.

Similar to the patient in A.F., here, as Schwartz testified, T.R.L. was unable to "have a reality based discussion about her after-care if she were able to leave the hospital." This finding is also supported by a chart note from two days after T.R.L. was admitted to St. Anne, where hospital staff reported that she was "not respond[ing] clearly about how she's doing with eating, drinking or sleeping."

9

The commissioner also found that a less restrictive treatment alternative was inappropriate and not in T.R.L.'s best interests "because she has not stabilized, is still exhibiting active symptoms of her behavioral health disorder, and is too symptomatic to meet her needs in a less restrictive setting." This finding is supported by Schwartz's testimony that while he was evaluating T.R.L., they discussed discharge planning but she described "a number of. . . . delusional housing arrangements." For example, she said that "she had a place in Burien," but the property owner had no record of her. She also claimed that "she could go to her sister's home," but the hospital was never able to get in touch with her sister.

Schwartz further noted that T.R.L. was unwilling to engage with outpatient services. He read chart notes from August 5, 2024, two days before the hearing, indicating that T.R.L. "continues to present with grandiose delusions." For example, she "thought that she worked at Boeing and now makes her own planes."

T.R.L. claims the evidence showed that she had improved and could address her own health and safety. For example, she conveyed to hospital staff that she had a yeast infection, was eating and sleeping well, was medication compliant, had health care insurance through Molina Medicaid, was independently conducting her daily activities, and planned to live with her sister. A chart note from August 6 indicated some improvement where T.R.L. ate her dinner and was "cooperative and respectful to staff." But the fact that T.R.L. had demonstrated some improvements while being treated does not negate the evidence that she continued to demonstrate delusional thinking at the time of the hearing and had not communicated a discharge plan or identified a place to stay after discharge.

We conclude that the commissioner's findings are supported by substantial evidence and the findings, in turn, support the conclusion that T.R.L. was gravely disabled as defined by RCW 71.05.020(25)(a). We therefore hold that the trial court did not err in ordering T.R.L. involuntarily committed for treatment for up to 14 days.

Affirmed.

_Chung, J._

WE CONCUR:

_____, ACJ      _Mann, J._