IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Detention of:<br><br>R.M.,<br><br>               Petitioner. | No. 87147-1-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUNG, J. — A trial court ordered R.M. involuntarily committed for treatment for a period of up to 14 days pursuant to the Involuntary Treatment Act (ITA), chapter 71.05 RCW. On appeal, R.M. challenges his commitment, arguing there was not substantial evidence to support the court's finding that he was gravely disabled. We disagree and affirm.

FACTS

R.M., a 75-year-old man, entered the Benson Heights Rehabilitation Center (Benson Heights) in May 2024. Benson Heights is a nursing and behavioral health facility that serves individuals with mental health conditions and provides rehabilitation services such as physical therapy, occupational therapy, 24-hour nursing assistance, and hands-on assistance. R.M. required nursing care due to wounds on his legs and mental health care to manage his schizophrenia and dementia.

During his time at Benson Heights, R.M. began to gradually refuse wound care and mental health medication. R.M. became more aggressive with the

nursing staff, climaxing in an incident on July 10, 2024, when he reportedly threw handheld exercise weights at a nurse. Staff called the police, who took R.M. to the Auburn MultiCare ("MultiCare") emergency department, where he stayed from July 10 to July 25. On July 17, the professional staff of MultiCare petitioned for 14-day commitment for involuntary treatment, arguing that R.M. was gravely disabled under RCW 71.05.

The trial court held a probable cause hearing on the petition on August 8-9, 2024. At the hearing, the State presented two witnesses: Maura Hughes, R.M.'s provider at Benson Heights, and Susan Surdez, MultiCare's court evaluator who testified both in her capacity as an expert witness and as a records custodian for MultiCare. R.M. also testified. The court granted the petition, finding R.M. gravely disabled under the ITA and that a less restrictive alternative was not in R.M.'s best interest at the time. R.M. timely appeals.

## DISCUSSION

Under the ITA, a person may be involuntarily committed for treatment of behavioral health disorders.[1] In re Det. of LaBelle, 107 Wn.2d 196, 201-02, 728 P.2d 138 (1986). However, a behavioral health disorder alone is not enough to permit the significant deprivation of liberty encompassed by a commitment order for involuntary treatment. Id. at 201. A court can order commitment for involuntary treatment if the person poses a likelihood of serious harm or is

---

[1] A "behavioral health disorder" is defined as "either a mental disorder as defined in this section, a substance use disorder as defined in this section, or a co-occurring mental disorder and substance use disorder." RCW 71.05.020(8). A "mental disorder" is defined as "any organic, mental, or emotional impairment which has substantial adverse effects on a person's cognitive or volitional functions." RCW 71.05.020(39).

gravely disabled. RCW 71.05.240(4)(a). The ITA defines "gravely disabled" in two distinct, alternative ways, often referred to as "Prong A" and "Prong B":[2]

> [A]s a result of a behavioral health disorder (a) Is in danger of serious physical harm resulting from a failure to provide for [their] essential human needs of health or safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over [their] actions and is not receiving such care as is essential for [their] health or safety.

RCW 71.05.020(25). Further, before a court can order an individual to be committed to a licensed treatment facility based on a finding that a person is gravely disabled, it must also consider whether any less restrictive alternatives to involuntary detention are in the best interests of "such person or others." RCW 71.05.240(4)(a).

For a 14-day commitment due to grave disability, the State must prove that a person is gravely disabled by a preponderance of the evidence. RCW 71.05.240(4)(a). Appeals of involuntary commitments are not moot because the challenged order, albeit expired, "may have adverse consequences on future involuntary commitment determinations." In re Det. of M.K., 168 Wn. App. 621, 625, 279 P.3d 897 (2012). On appeal, we review whether substantial evidence supports a trial court's findings of fact and whether those findings support its conclusions of law. LaBelle, 107 Wn.2d at 209. Substantial evidence is "the quantum of evidence 'sufficient to persuade a fair-minded person of the truth of the declared premise.' " In re Det. of K.P., 32 Wn. App. 2d 214, 221, 555 P.3d 480 (2024) (quoting In re Det. of H.N., 188 Wn. App. 744, 762, 355 P.3d 294

---

[2] The form Findings of Fact and Conclusions of Law ordering involuntary treatment or commitment uses these terms.

(2015)). We review such challenges in the light most favorable to the State. In re Det. of B.M., 7 Wn. App. 2d 70, 85, 432 P.3d 459 (2019).

Here, the trial court found R.M. gravely disabled under both alternative definitions of "gravely disabled." Further, the court found that a less restrictive alternative was "not in the best interest of [R.M.] or others." R.M. challenges all three findings. We disagree and affirm.

As to the first alternative definition of "gravely disabled," RCW 71.05.020(25)(a), there was substantial evidence that as a result of R.M.'s behavioral health disorders, he was in danger of serious physical harm resulting from a failure to provide for his essential human needs of health or safety. Essential needs include "food, clothing, shelter, and medical treatment." LaBelle, 107 Wn.2d at 205.

At the time of the probable cause hearing, R.M. had a diagnosis of dementia and a working diagnosis of schizophrenia. R.M. argues, however, that "it was physical disability, not a mental disorder, that caused R.M. to require nursing assistance to provide for his essential human needs." While it is true that physical wounds on his legs caused R.M. to need a wheelchair and "assistance with transferring in and out of the wheelchair, toileting, wound care, and preparing meals for himself," it was R.M.'s mental disorder that caused him to refuse such assistance and, thus, to be unable to provide for his essential human needs outside of a hospital setting.

Hughes testified that at Benson Heights, R.M. gradually refused his wound care and "became very distrustful of nurses." Surdez testified that when she met

4

with R.M. on July 11 at MultiCare, "his presentation was very disheveled, and he had his pant legs pulled up. I could see large red scabs on his legs." When Surdez saw R.M. later at the hospital emergency department, he did not remember her, and "told [her] that he had not been sleeping, talked about people stealing his money." He demonstrated symptoms of delusions, paranoia, and confusion, evidenced through "tangential speech, labile mood, agitation, poor impulse control, poor insight, and poor judgment."

Notes in MultiCare's records indicated that R.M. "report[ed] pain in [his] tailbone" and staff noted "small abrasions and rashes" on his "bilateral lower legs." R.M. "refuse[d] care, [to] provide blood and urine and talk[ed] with hostility." He "did not answer questions regarding suicidal ideation, homicidal ideation, or a substance use disorder." Further, R.M. refused medication, demonstrated agitation and constipation, and "reported pain on his coccyx but refused [an] x-ray of his pelvis." R.M. was "mildly impulsive during evaluation with . . . moderate difficulty, redirection to questions and tasks." Although R.M. reported difficulty sleeping, he refused melatonin. Further, multiple notes indicated that attempts to educate R.M. as to his treatment were ineffective. Additionally, Surdez testified that R.M.'s mental impairments had a "substantial adverse effect on [R.M.'s] cognitive and volitional control" and were "presenting as gravely disabled in that he is in danger of serious physical harm from a failure and inability to provide for his essential needs of health and safety."

Based on the evidence presented, the trial court found that R.M. was gravely disabled under "Prong A," the first alternative definition of "gravely disabled." The court explained,

> The Respondent needs assistance with everything—toileting, moving from bed to wheelchair, medications. He has too much confusion around his medications and he is not easily redirectable. . . . He needs housing. He is in a wheelchair and cannot provide for his own food, clothing or shelter outside of the hospital setting.

While R.M.'s physical condition caused his need for assistance, the evidence demonstrated that he was "not capable of making the reasonable and rational decisions about his treatment needs because of his ongoing symptoms . . . preventing him from meeting his basic care needs." And, as Surdez testified, R.M. "continue[d] to have these behaviors . . . that led him to hospitalization in the first place."

But R.M. contends that he "had become medication compliant with additional patient education" at MultiCare and MultiCare staff were "able to achieve this using methods that were *not* only available in a hospital setting: by allowing him to count the medication, having different staff speak with him, assuaging his suspicions, and simply being patient." However, the notes from MultiCare indicate that, even when R.M. became "redirectable," he was still "labile" and "require[d] stabilization." Further, evidence of improvement that "lessened or eliminated the 'imminence' of the danger of serious harm caused by that person's failure to provide for his essential health and safety needs" does not mean that an individual is not "still unable to provide for their essential health and safety needs outside of a hospital setting" under RCW 71.05.020(25)(a). LaBelle,

107 Wn.2d at 203. Here, there was substantial evidence supporting the trial court's finding that R.M. was gravely disabled under "Prong A," the first alternative definition of "gravely disabled," as R.M.'s "ongoing behavioral dysregulation" caused him to lose housing and refuse medical treatment, resulting in further health issues.[3]

As to "Prong B," the second alternative definition of "gravely disabled," R.M. argues that the trial court lacked evidence that R.M. had severely deteriorated from his baseline because "R.M.'s baseline was to behave in confrontational ways that could be perceived as aggressive but did not actually physically endanger others." This argument mischaracterizes R.M.'s baseline. Hughes testified to the trial court that when R.M. first arrived at Benson Heights, he was "really excited to be there," and although he was "a little suspicious of nursing staff" and "exhibited some delusional behaviors, such as . . . more grandiose delusions," his behavior was "manageable and redirectable" and he was accepting mental health medication and medication and care for his leg wounds. Suarez testified that R.M.'s baseline risk was "medium" and that, at the time of the probable cause hearing, R.M. was "at elevated risk." Indeed, even R.M.'s trial counsel appeared to acknowledge that R.M. had departed from that baseline by suggesting in closing argument that R.M. was "functioning at what might be a new baseline for him." Thus, there was substantial evidence to

---

[3] R.M. asserts in his reply brief that the State's argument that R.M.'s behavior caused him to lose his housing "relies on a different theory of detention, 'likelihood of serious harm' under RCW 71.05.020(37)(a)." But the State did not advance this theory. Instead, the State argued, and the trial court found, that R.M. was gravely disabled under RCW 71.05.020(25)(a) and less restrictive alternatives were not in his best interest because his destabilized behavior placed his housing—an "essential human need of health or safety"—at risk.

support the trial court's finding that R.M. had shown "severe deterioration in routine functioning."

Indeed, the facts here are similar to that of appellant Trueblood in LaBelle, who similarly challenged the sufficiency of evidence of grave disability at his 14-day involuntary commitment hearing.[4] 107 Wn.2d at 214. There, the State's expert witness testified that Trueblood "was in an acute phase of chronic schizophrenia" and had demonstrated a "repeated and escalating loss of cognitive or volitional control." Id. at 215. The evidence also reflected that Trueblood "lack[ed] insight into his condition" and was "not interested in taking medication or otherwise seeking treatment." Id. The court found that

> [T]here is ample evidence in the record to indicate severe deterioration of routine functioning, including escalating and repeated loss of cognitive and volitional control, and an inability to care for essential needs. There is also evidence that Trueblood was unable to make a rational decision with respect to his need for treatment and care and that treatment was essential to his health and safety. We conclude that the trial court's finding of grave disability is amply supported by the evidence.

Id. at 215-16. Similarly, here, the State's expert witness testified about R.M.'s schizophrenic condition and loss of cognitive and volitional control. Further, R.M.'s testimony at the probable cause hearing demonstrated a lack of insight into his condition and lack of interest in treatment. For example, R.M. disputed his diagnoses, stating "there are records that they have me bipolar and schizophrenic. I'm not there. I only feel relaxed and then I become normal." When asked if he was willing to take "psychiatric medication," R.M. stated

---

[4] Trueblood also challenged the sufficiency of the evidence of grave disability at a 180-day involuntary commitment hearing, which the State must prove by "clear, cogent, and convincing" evidence. LaBelle, 107 Wn.2d at 209. Only the discussion of Trueblood's 14-day commitment is considered here due to the different evidentiary standard at this stage.

"No. To a certain extent, I will. They have me on so many pills, it's overdosing, too many pills." R.M. also repeatedly interrupted counsel, witnesses, and the court throughout the hearing. Accordingly, we hold that the trial court's finding of grave disability is supported by substantial evidence.

Finally, R.M. contends that the trial court "erred by failing to meaningfully consider whether less restrictive treatment was in R.M.'s best interest" because it "ignore[d] the capabilities of the treatment alternatives that were available to R.M." R.M. had expressed a desire to get treatment at the Veterans Administration of Lakewood, Campus Number 81 ("American Lake"). Further, Hughes testified that R.M. would be allowed to return to Benson Heights pending reevaluation by their admissions team, confirming that he "was compliant with taking his medications and receiving care from nursing care services" and was not "a danger to himself or other people." The trial court found, however, that "a less restrictive alternative is not appropriate nor in [R.M.'s] best interests because he is not mentally stable and is too symptomatic to comply with a less restrictive treatment order at this time."

R.M. argues that the court could have ordered R.M. to comply with medication management or could have ordered R.M. be involuntarily medicated under RCW 71.05.585(2)(a) and (3). But R.M. did not ask the trial court to consider forcefully medicating him as a less restrictive alternative. Indeed, R.M. testified that he continued to believe he was being over-medicated and that he did not want to return to Benson Heights. The court did not err in finding that R.M. was "too symptomatic to comply" with a less restrictive alternative if the only

9

way he would have complied would be pursuant to additional court-ordered involuntary medication treatment.

Nevertheless, R.M. now argues that Benson Heights was a suitable alternative because "there was no reason given that its staff could not continue the patient education that had begun in the hospital" and that American Lake was also a reasonable alternative because it "was a medical campus that offered psychiatric and medical care through the VA." But, as described above, notes from MultiCare suggested that patient education of R.M. had been unsuccessful. It was not until August that notes reflected R.M. was "[l]abile but is redirectable" and began to take medications. Even then, the progress notes indicated that R.M. still "require[d] stabilization." Accordingly, in its oral ruling, the trial court found,

> A less restrictive treatment alternative is not appropriate nor in [R.M.'s] best interest because he's not stabilized . . . [and] has not been consistently cooperative with care and treatment, which does not bode well for compliance with a less-restrictive treatment order at this time, and the evidence establishes [R.M.] remains too symptomatic to comply with a less-restrictive treatment order at this time and to secure his own needs.

The trial court did not, as R.M. suggests, "simply accept[] Ms. Surdez's assertion that R.M. was too symptomatic and not compliant enough with medication to be suitable for a less restrictive alternative." Rather, as described above, substantial evidence supported the trial court's determination that a less restrictive alternative was not in R.M.'s best interest.

CONCLUSION

We affirm.

_____
Chung, J.

WE CONCUR:

_____          _____
Feldman, J.                                                Smith, J.